**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Marcus Lamour HARVEY,**
**Defendant–Appellant.**

**No. 92–2366.**

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 11, 1993.

Decided Feb. 9, 1994.

Rehearing and Rehearing En Banc
Denied May 5, 1994.

**110**

Robert Haviland, Asst. U.S. Atty., Nancy A. Abraham (argued), Flint, MI, for plaintiff-appellee.

Marcus Lamour Harvey (briefed), Milan, MI, Robert E. Caron (argued and briefed), Caron & Associates, Sylvan Lake, MI, Arthur J. Weiss (briefed), Arthur J. Weiss Assoc., Farmington Hills, MI, for defendant-appellant.

Before: KEITH, GUY, and BATCHELDER, Circuit Judges.

BATCHELDER, Circuit Judge.

Marcus Harvey appeals from the judgment of conviction entered on his conditional plea of guilty following the district court's denial of his motion to suppress the evidence obtained from a warrantless search of the vehicle in which he was a passenger. For the reasons that follow, we affirm the conviction.

Defendant makes three assignments of error,[1] claiming that the district court was required on any of three grounds to suppress both the physical evidence and the defendant's statements obtained as a result of the stop and the search of the vehicle. First, he claims clear error in the district court's finding that the stop of the vehicle in which he was riding was not pretextual. Second, he argues that the district court erred in finding that the warrantless search of the stopped vehicle was a valid inventory search. Finally, he argues that the district court erred in determining that the officers who stopped the car had probable cause to search it.

Briefly stated the facts are these. On May 22, 1990, on I–475 in Genesee County, Michigan, the defendant was a passenger in a 1978 Chevrolet automobile that had no front bumper or right front headlight and that was clocked by police officers exceeding the speed limit by several miles per hour. The officers stopped the vehicle for speeding and equipment violations and because, as one officer later testified at the suppression hearing, "[t]he vehicle that I observed with the defective equipment was very similar in appearance and profile to several other vehicles that I have stopped which ultimately ended in arrests of drug traffickers." When the driver of the car was unable to produce a driver's license, he was asked to step out of the car. He admitted then that his license was suspended; he was placed under arrest for driving with a suspended license; and, while being searched incident to the arrest, he was found to have a rock of crack cocaine in his jacket pocket. The driver gave conflicting stories about who owned the car, but the vehicle registration that he produced showed defendant Marcus Harvey to be the owner. Neither Harvey nor the other passenger could produce a driver's license (Harvey's license had been suspended also and the

---

1. Defendant also filed a *pro se* brief in which he argues that his conviction must be reversed because the United States has no territorial jurisdiction over the place where the crime was committed. This argument was not advanced by defendant's counsel, and is patently without merit.

other passenger had never obtained a license), or any other form of identification. Both passengers were asked to get out of the vehicle and were patted down for weapons by the officers; no weapons were found. Following the policy of their police department, the officers impounded the car because there was no licensed driver to drive it away, and conducted an inventory search of the car. Because none of the occupants had the key to the vehicle's trunk, the officers removed the back seat in order to inventory the trunk and found there a pair of men's sweat pants whose pockets contained 78 rocks of crack cocaine and six live .357 magnum revolver cartridges. Also in the trunk was a bulletproof vest. At this point the officers pried open the trunk of the car to more carefully search it and found a .357 magnum six-shot revolver.

Defendant Harvey was arrested for possession with intent to distribute cocaine and possession of a firearm during the commission of a felony. After being given the *Miranda*[2] warnings, defendant was interviewed and provided police with a written statement. Defendant was subsequently indicted for possession with intent to distribute cocaine, conspiracy to distribute cocaine, and use of a firearm during a drug trafficking offense. The trial court denied defendant's motion to suppress the evidence seized during the search of the vehicle and the statements made by him following his arrest, and defendant entered this conditional plea.

■ Defendant's first assignment of error is foreclosed by this court's recent en banc decision in *United States v. Ferguson*, 8 F.3d 385 (6th Cir.1993). Defendant does not dispute that the automobile in which he was riding was exceeding the speed limit at the time it was stopped, or that it was in violation of the applicable state laws because of its equipment deficiencies. Defendant concedes that had the officers stopped the car solely because of either or both of those violations, the stop would have been lawful. Rather, defendant argues that no reasonable police officer would have stopped the car for those violations absent some other motive, and that the actual reason for the stop in this instance was not the obvious violations of the law but the fact that the car and its occupants fit the officer's notion of a "drug profile." In *Ferguson*, we held that

so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment. We focus not on whether a reasonable officer "would" have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred), or whether any officer "could" have stopped the suspect (because a traffic violation had in fact occurred), but on whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop. The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop. It is also irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.

*Id.* at 391 (citation omitted). There is no dispute about the fact that the traffic violations occurred, and the district court found that those violations would have been obvious to any officer observing the car. Because that finding is not clearly erroneous, we hold that, under *Ferguson*, the stop of the car was not pretextual and was lawful.

■ Nor did the district court err in determining that the search of the vehicle in which Harvey was a passenger was lawful. In fact, the district court found that the warrantless search of the automobile was permissible under either the "automobile exception" set out in *California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991), or as an inventory search pursuant to the standards set out in *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). A review of the record of the suppression hearing persuades us that the district court's findings of fact cannot be said to

---

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.     1602, 16 L.Ed.2d 694 (1966).

be clearly erroneous, either as to the facts upon which it based its determination that the officers had probable cause to believe that the car contained drugs or other contraband, or as to the fact that the officers' impounding of the car and the subsequent inventory search were pursuant to departmental policy and not for the purposes of a "fishing expedition." Very recently this circuit addressed a search of an automobile under circumstances very similar to these, and held that

> A police officer may search the passenger compartment of an automobile incident to the lawful custodial arrest of the occupant of the vehicle without a warrant or probable cause. This is so even if the arrestee has been separated from his car prior to the search of the passenger compartment. Further, where police have probable cause to believe that a vehicle contains contraband, they may search the entire vehicle and any containers located within it.

*United States v. Mans,* 999 F.2d 966, 968–69 (6th Cir.1993) (citations omitted). In that case, the defendant himself was the driver of the car. It is immaterial that the defendant here was a passenger, although the vehicle's registration showed him to be the owner. We hold that the cocaine found on the person of the driver, the false information given to the officers regarding the car's ownership, and the fact that none of the individuals in the car had a valid driver's license, provided probable cause for the officers to believe that the car contained other drugs or paraphernalia, and that the search of the entire automobile was proper.

■ Further, because the defendant failed to demonstrate that the police officers impounded and inventoried the car "in bad faith or for the sole purpose of investigation," *see Colorado v. Bertine,* 479 U.S. at 372, 107 S.Ct. at 741, we hold that the search was proper as an inventory search as well. As the *Bertine* Court pointed out, police are potentially responsible for property taken into their custody, and inventory searches of such property necessary to secure it serve to protect the property, the public, and the police. *Id.* at 373, 107 S.Ct. at 742. Here the police lawfully exercised their discretion in deciding to impound the vehicle in the absence of any licensed driver to attend to it, and they followed departmental policy in doing so.

Having held that both the stop and the search of the vehicle were lawful, we hold that the district court did not err in refusing to suppress the evidence obtained in the search and the statements made by the defendant after his arrest as a result of the search. The judgment of conviction is affirmed.[3]

KEITH, Circuit Judge, dissenting.

Because I strongly disagree with the majority's conclusion that the district court correctly denied Harvey's motion to suppress evidence, I respectfully dissent.

The Sixth Circuit recently discussed pretextual stops and held the correct inquiry is "whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop." *United States v. Ferguson,* 8 F.3d 385 (6th Cir.1993). I dissented in *Ferguson* because I believe this test is ripe for

---

**3.** We are constrained to respond briefly to the dissent. The dissent makes much—indeed, everything—of the fact that Officer Collardey testified that one of the reasons this vehicle caught his attention was that it fit his own empirically justified profile of drug couriers, which included a racial factor. And as the dissent's quotations from the record indicate, Collardey did indeed say that he took note of occupants' race. But the dissent entirely mischaracterizes this testimony when it says repeatedly that Collardey testified that he stopped the vehicle because the occupants were African–Americans, see Op. at 113, 115; when it says that "Collardey testified [that] if the occupants had not been African–Americans, he would not have stopped the car," *id.* at 113–14; and when it says that Collardey had a "primary race-based motivation" for the stop, *id.* There is no such testimony in the record; the dissent quotes the testimony that most supports its view of this case, and nowhere in that testimony is there any suggestion that Collardey's use of race was a "but for" cause of the stop. Nor is such an inference justified based on this record. It does not follow from the fact that Collardey testified that race was a factor in his "why I stopped the vehicle" calculus that the suspects' race was a "necessary" cause of the stop.

abuse. Today, although I am bound by the law of this circuit, I write separately to emphasize how the instant case illustrates the abuses of which I warned in *Ferguson* and to insist that egregious circumstances, such as in this case, warrant an exception to the *Ferguson* test.

In the instant case, Officer Collardey admits *repeatedly* he stopped the vehicle because the occupants were African–Americans. On redirect he testified:

Q: Officer Collardey, you gave the Prosecutor two reasons for your effecting a traffic stop. One was the traffic infraction, speeding and equipment violation, and then you referred to something that I hadn't heard yet today, that was, fitting the general description of some sort of a profile?

A: It did, yeah, it did fit.

Q: Was it a certain way that the damage had been on this car that made it look like it fit a profile for you?

A: No, I made that statement on the basis of my experience on that highway, and drug traffickers that I have arrested coming to the Flint area.

Officer Collardey continued:

Q: What else was it that made you think this fits some sort of a profile?

A: There were three young black male occupants in an old vehicle.

Q: Three young black male occupants in a car?

A: Yes, sir.

Q: And that was the basis or part of the basis for your stopping that car?

A: The age of the vehicle and the appearance of the occupants.

Under oath, Officer Collardey stated he stopped the vehicle because there were three African–American males in an old car. Recognizing Officer Collardey's use of the minor traffic violations as pretext for stopping the vehicle, the district judge improperly rehabilitated Officer Collardey's testimony:

Q (district judge): What was it about the appearance of the occupants that got your attention?

A: It wasn't so much the appearance. **Almost every time that we have arrested drug traffickers from Detroit, they're usually young black males** · **driving old cars.**

Q (district judge): Was that why you stopped the car, or did you stop the car for traffic violations?

A: I stopped them for traffic violations.

(emphasis added). Only after the court gave Officer Collardey an either/or question did he give the appropriate response.

My dissent in *United States v. Ferguson* emphasized that the test, as adopted by the majority, provides officers with unlimited discretion to determine whom they will stop for minor traffic violations. As a result, the court renders meaningless the Fourth Amendment's prohibition of unwarranted searches and seizures.

The Fourth Amendment imposes "a standard of 'reasonableness' upon the exercise of discretion by government officials." *Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). Under the *Ferguson* test, the court's failure to limit an officer's discretion to stop motorists once a traffic offense establishes probable cause negates any reasonableness inquiry. In essence, the absence of limitations allows pretext to serve as probable cause thus undermining the guarantees of the Fourth Amendment.

The instant case clearly pinpoints the abuses to which the *Ferguson* test is subject. By myopically focusing on whether probable cause exists to believe a motorist committed a traffic offense, the majority waived any meaningful review of the seizure and its legality, and allowed pretext (the traffic violations) to serve as probable cause. Here, Harvey and his companions committed minor traffic violations. They drove three miles over the speed limit in a car which was missing a bumper and a headlight. Indisputably, probable cause existed to believe a traffic offense occurred. The problem, however, is the officer said he stopped the vehicle because the occupants were African–Americans. Officer Collardey testified if the occupants had not been African–Americans, he

would not have stopped the car. Officer Collardey's improper motivation for the stop inserted an unconstitutional illegality into the stop. Applying the *Ferguson* test, because a minor traffic violation was present, the majority concludes Collardey's primary race-based motivation, although illegal, is irrelevant.

Equal Protection principles absolutely and categorically prohibit state actors from using race to differentiate between motorists. Yet, the majority acquiesces to an officer's substitution of race for probable cause and essentially licenses the state to discriminate. Moreover, the majority states race-based motivation is irrelevant under these or any circumstances. Not only is the officer's race-based motivation relevant, it is patently unconstitutional.

The Fourteenth Amendment of the United States Constitution prohibits state actors from denying persons equal protection of the laws. U.S. Const. amend. XIV, sec. 1; *see also Wygant v. Jackson Brd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *City of Richmond v. Croson,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In *Samaad v. City of Dallas,* the Fifth Circuit stated: "The heart of the equal protection clause is its prohibition of discriminatory treatment. If a governmental actor has imposed unequal burdens based upon race, it has violated the clause." 940 F.2d 925 (5th Cir.1991). Traditionally, courts review state action singling a person out solely on the basis of race with the strictest scrutiny, and generally condemn the action. *See, e.g. Croson,* 488 U.S. at 493, 109 S.Ct. at 721–22. (Holding the City of Richmond's voluntary affirmative action plan was not "narrowly tailored to remedy prior discrimination," a compelling governmental interest).

In my twenty-six years as a federal judge, although I have suspected discrimination by police officers, I have never heard an officer *admit* he stopped an individual based on the color of his skin. This case presents blatantly egregious circumstances and warrants an exception to the *Ferguson* test. Such an exception does not grant special treatment to African–Americans, but merely ensures equal treatment as guaranteed by the Equal Protection Clause. The majority's willful disregard of the flagrant discriminatory treatment in this case endorses a system where one set of traffic regulations exist for African–Americans, like myself, and a more lenient set exists for white Americans. For the same minor traffic infraction, a white motorist remains an unimpeded violator, whereas an African–American motorist automatically becomes a suspected felon and menace to society. Such disparate treatment alienates and ostracizes African–Americans, fortifying their badge of second-class citizenship.

As the old adage warns, the more things change, the more they remain the same. In Montgomery, Alabama, on January 26, 1956, police officers arrested and jailed Dr. Martin Luther King, Jr. for allegedly driving thirty miles per hour in a twenty-five mile per hour zone. *See* Randall Kennedy, *Martin Luther King's Constitution: A Legal History of the Montgomery Bus Boycott,* 98 Yale L.J. 999, 1028 (1989). Today, everyone readily acknowledges the police officers stopped, arrested, jailed and harassed Dr. King because he was an African–American and because he actively and vigorously sought equal protection and equal treatment for African–Americans. Today, almost thirty years later, the majority's actions in this case again allow police officers to stop individuals based on their race under the guise of an insignificant traffic violation. It is a sad commentary that this court not only approves disparate treatment based on race but legitimizes a "legal" basis for disparate treatment. Certainly this circuit cannot in good faith state that the decisions in *Ferguson* and in this case represent equal justice under law.

Unfortunately, the present case is not unique; rather, it eloquently illustrates the plight of many African–Americans. News reports detail unreasonable stops of African Americans by police motivated solely by irrational and illogical racial stereotypes. For example, a national newspaper reported "the same percentage of whites and blacks use drugs." Sam Meddis, *Suburbs 'Have Gotten Off Easy,' Whites' Drug Activity Often Better*

*Hidden,* USA Today, (July 26, 1993), at 6A. Arguably, for every 100 people arrested for drug use or trafficking, 50 should be black. Blacks, however, are four times as likely to be arrested for drugs in central cities, six times as likely in suburbs, and three times as likely in rural areas. *Id.* In Michigan, the ratios are much worse. For example:

| | |
|---|---|
| Detroit | 2:1 |
| Warren | 32:1 |
| Royal Oak | 27:1 |
| Livonia | 43:1 |
| Dearborn Heights | 40:1 |
| Lincoln Park | 46:1 |

*Id.* African–Americans are more likely to be arrested because drug courier profiles reflect the erroneous assumption that one's race has a direct correlation to drug activity. *See United States v. Taylor,* 956 F.2d 572, 580 (6th Cir.1992) (*en banc*) (Keith dissenting) (citing Sheri Lynn Johnson, *Race and the Decision to Detain a Suspect,* 93 Yale L.J. 214, 234 (1983)); *see also* Morgan Cloud, *Search and Seizure by the Numbers: The Drug Courier Profile and Judicial Review of Investigative Formulas,* 65 B.U.L.Rev. 843 (1985) (discussing the historical use of drug profiles).

The deprivation of Defendant Harvey's constitutional rights in this case demonstrates the victimization of African–Americans by a flawed and stereotypical system. His case presents clear and articulated racial discrimination. National statistics illustrate how the insulation of the use of illegitimate, illegal and illogical stereotypes disproportionately impacts African–Americans. Concededly, disproportionate impact alone does not constitute a violation of the Equal Protection Clause; intentional discrimination, however, does. *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976). Here, Officer Collardey testified he stopped the vehicle because it contained three young African–Americans. The majority, however, blindly refuses to recognize this glaring constitutional violation and suppress the evidence that flowed from it.

This court's application of the *Ferguson* test to this case is repugnant to our Constitution and national conscience and does not reflect due regard for the integrity of our justice system. Courts exist to promote justice and judges have the duty to support and protect the Constitution as well as to observe its fundamental guarantees. Unfortunately, in this case, the Sixth Circuit abdicates that sacred duty.