RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0339p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

No. 04-1925

CURTIS ELLISON,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-80084—Denise Page Hood, District Judge.

Argued: October 5, 2005

Decided and Filed: September 5, 2006

Before: MOORE, GIBBONS, and GRIFFIN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Patricia G. Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. William M. Hatchett, HATCHETT, DEWALT & HATCHETT, Pontiac, Michigan, for Appellee. **ON BRIEF:** Patricia G. Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. William M. Hatchett, HATCHETT, DEWALT & HATCHETT, Pontiac, Michigan, for Appellee.

GIBBONS, J., delivered the opinion of the court, in which GRIFFIN, J., joined. MOORE, J. (pp. 7-15), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge. Appellant United States appeals from a district court order granting defendant-appellee Curtis Ellison's motion to suppress. Because we conclude that the district court erred in its Fourth Amendment analysis, we vacate the order granting the motion to suppress and remand for further proceedings.

I.

The central issue in this case is whether the Fourth Amendment is implicated when a police officer investigates an automobile license plate number using a law enforcement computer database. While on routine patrol, Officer Mark Keeley of the Farmington Hills (Michigan) Police Department

pulled into a two-lane service drive adjacent to a shopping center. Keeley testified that a white van, with a male driver inside, was idling in the lane closest to the stores, in an area marked with "Fire Lane" and "No Parking" signs. Keeley did not issue the van a citation for being illegally parked, nor did he request that the driver move the van. Rather, he moved into a parking spot to observe the van and entered the vehicle's license plate number into his patrol car's Law Enforcement Information Network ("LEIN") computer. The LEIN search revealed that the vehicle was registered to Curtis Ellison, who had an outstanding felony warrant. Following standard procedure, Keeley radioed for back-up and continued observing the van. After two minutes, another male got into the van, and it drove away. Officer Keeley followed the van until his back-up was nearby, and then activated his lights and stopped the van.

Officer Keeley approached the driver's-side window as his back-up arrived. He advised the driver that he was being stopped for parking in a fire lane and asked for license, registration and proof of insurance. The driver, identified as Edward Coleman, stated that he had only stopped in front of the store to wait for the passenger. At this time the passenger stated that he was the registered owner of the vehicle. Keeley verified the passenger's identity as Curtis Ellison and moved to the passenger side of the van. Keeley notified Ellison that he was being arrested on the outstanding warrant. Ellison stepped out of the van, and during the routine safety pat-down, two firearms were found. Coleman was released with a warning about parking in a fire lane.

Ellison was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Prior to trial, he made a timely motion to suppress the firearm as the fruit of an illegal search. After holding a hearing, the district court made a factual finding that the van was not parked illegally, and thus, the officer did not have probable cause to run the LEIN check of Ellison's license plate. The court issued a Memorandum Opinion and Order granting the motion to suppress under the "fruit of the poisonous tree" doctrine.

The government filed a timely appeal. This court has jurisdiction to hear the government's appeal from an order granting a motion to suppress evidence under 18 U.S.C. § 3731, as the government has certified that the appeal is not taken for the purposes of delay and that the evidence is a substantial proof of a fact material to the proceeding.

II.

This court reviews a district court's decision on a motion to suppress evidence under a dual standard. *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Factual findings are reviewed for "clear error" and will only be set aside when the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). As the government does not challenge the district court's finding that the van was not parked illegally, this appeal does not implicate any factual findings. Rather, it concerns only legal conclusions, which are reviewed de novo. *Hill*, 195 F.3d at 264.

The government argues on appeal that Ellison had no reasonable expectation of privacy in the information contained on his license plate, and thus, no probable cause was required for Officer Keeley to run the LEIN check. Ellison contends that the government waived this argument by not raising it in the district court. It is true that the government based its oral argument in the district court on the fact that the van was parked illegally, without addressing the specific interaction between license plate information and the Fourth Amendment.[1] However, defendant's motion to suppress did not allege or argue a reasonable expectation of privacy. In fact, neither party made any

---

[1] The government's written response to the motion made a general assertion that the stop and investigation were constitutional but did not specifically address whether there was a privacy interest in the information on the license plate.

argument in the district court regarding the expectation of privacy in a license plate. The discussion at the suppression hearing focused instead on probable cause – whether the van was parked illegally.

Although the district court did not expressly state that Ellison had a reasonable expectation of privacy in the information contained on his license plate, such a conclusion was necessarily implied by the court's ruling that a Fourth Amendment violation occurred. "[T]he State's intrusion into a particular area . . . cannot result in a Fourth Amendment violation unless the area is one in which there is a 'constitutionally protected reasonable expectation of privacy.'" *New York v. Class*, 475 U.S. 106, 112 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). Thus, the district court could only find that the LEIN search violated the Fourth Amendment if it first concluded that Ellison had a 'constitutionally protected reasonable expectation of privacy' in his license plate number.

Ellison correctly notes the long-standing rule that this court generally will not consider an argument not raised in the district court and presented for the first time on appeal. *See, e.g.*, *Foster v. Barilow*, 6 F.3d 405, 408 (6th Cir. 1993); *United States v. Ovalle*, 136 F.3d 1092, 1108 n.17 (6th Cir. 1998). An exception can be made, however, for "exceptional cases" or if failing to consider the argument would result in a "plain miscarriage of justice." *Pinney Dock and Transport Co. v. Penn Central Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988); *In re Hood*, 319 F.3d 755, 760 (6th Cir. 2003), *aff'd sub nom. Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004). This is such an exceptional case. The question – whether a motorist has a privacy interest in his license plate – is a purely legal one.[2] As the parties have fully briefed the issue, it is "presented with sufficient clarity and completeness" to ensure a proper resolution. *Pinney Dock*, 838 F.2d at 1461. It requires no further development of the record at the district court level, and thus, Ellison will not be prejudiced by the inability to present evidence to that court. On the other hand, failing to consider the issue would result in a plain miscarriage of justice – namely, allowing a conclusion of law to stand that is clearly in error. Based on these factors, we consider the government's argument that the LEIN investigation of Ellison's license plate does not implicate the Fourth Amendment.

III.

This court has not previously addressed in a published opinion the question of whether an individual has a reasonable expectation of privacy in his license plate. In two unpublished decisions, however, this court has agreed with the other circuits that have decided this issue by holding that no such privacy interest exists. The reasoning of these opinions, as well as that of the Supreme Court in related cases, leads us to agree that a motorist has no reasonable expectation of privacy in the information contained on his license plate under the Fourth Amendment.

A tenet of constitutional jurisprudence is that the Fourth Amendment protects only what an individual seeks to keep private. *Katz*, 389 U.S. at 351-52. "What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Id.* at 351. It is also settled that "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure . . . ." *Harris v. United States*, 390 U.S. 234, 236 (1968). Following this reasoning, the Court held that an automobile's Vehicle Identification Number, located inside the passenger compartment, but visible from outside the car, does not receive Fourth Amendment protection:

> [I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile.

---

[2]We are not persuaded by the dissent's attempt to create a factual issue where none exists. The questions posed by the dissent, *see* Dis. Op. at 4, are not relevant to the question of whether the entry of Ellison's license plate number into the LEIN system constituted a "search" under the Fourth Amendment. *See infra* Part III.

> The VIN's mandated visibility makes it more similar to the exterior of the car than to the trunk or glove compartment. The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a "search."

*Class*, 475 U.S. at 114. Logically, this reasoning extends to a legally-required identifier located *outside* the vehicle.

No argument can be made that a motorist seeks to keep the information on his license plate private. The very purpose of a license plate number, like that of a Vehicle Identification Number, is to provide identifying information to law enforcement officials and others. The reasoning in *Class* vis-a-vis Vehicle Identification Numbers applies with equal force to license plates: "[B]ecause of the important role played by the [license plate] in the pervasive governmental regulation of the automobile and the efforts by the Federal Government to ensure that the [license plate] is placed in plain view," a motorist can have no reasonable expectation of privacy in the information contained on it. 475 U.S. at 114 (discussing Vehicle Identification Numbers).

The dissent implies that even if an individual has no expectation of privacy in a license plate number, a privacy interest is somehow created by the entry of this information into a law-enforcement computer database. This argument flies in the face of established Fourth Amendment doctrine. First, despite the dissent's concerns over the information available in a LEIN search, Ellison had no privacy interest in the information retrieved by Officer Keely. The obvious purpose of maintaining law enforcement databases is to make information, such as the existence of outstanding warrants, readily available to officers carrying out legitimate law enforcement duties. The dissent fails to state how using a license plate number – in which there is no expectation of privacy – to retrieve other non-private information somehow creates a "search" for the purposes of the Fourth Amendment.[3] Moreover, the computer investigation utilized in this case was far less invasive than other government actions that fall outside the protections of the Fourth Amendment. *See, e.g.*, *Oliver v. United States*, 466 U.S. 170, 177 (1984) (entering private property with "No Trespassing" signs to observe marijuana plants in an "open field" not visible from outside the property); *Dow Chemical Co. v. United States*, 476 U.S. 227, 239 (1986) (photographing an industrial complex with a precision aerial mapping camera); *California v. Ciaolo*, 476 U.S. 207, 213-14 (1986) (using aerial surveillance in public airspace to observe the curtilage of a private residence); *Smith v. Maryland*, 442 U.S. 735, 745-46 (1979) (placing a pen register on a phone line to record the numbers dialed from a private residence). This is not a case where the police used a technology not available to the public to discover evidence that could not otherwise be obtained without "intrusion into a constitutionally-protected area." *Kyllo v. United States*, 533 U.S. 27, 34-35 (2001) (holding that the use of thermal-imaging technology to detect heat inside a private home violates the Fourth Amendment). The technology used in this case does not allow officers to access

---

[3]The website of the Michigan State Police contains the following information about the LEIN system:
The Michigan Law Enforcement Information Network (LEIN) is a statewide computerized information system, which was established July 1, 1967, as a service to Michigan's criminal justice agencies. The goal of LEIN is to assist the criminal justice community in the performance of its duties by providing and maintaining a computerized filing system of accurate and timely documented criminal justice information readily available to all criminal justice agencies.
* * *
LEIN access is permitted to criminal justice agencies in the discharge of their official, mandated responsibilities.
*See* Michigan State Police, "LEIN Field Services," *at* http://www.michigan.gov/msp/0,1607,7-123-1564-16248--,00.html (last accessed Aug. 18, 2006). While we would be justified in taking judicial notice of this information, *see* Fed. R. Evid. 201, it is unnecessary to do so to dispose of this appeal. The above quote amply illustrates, however, the fallacy of the dissent's argument that one has an expectation of privacy in a license plate number or the existence of an outstanding arrest warrant. The dissent's further attempt to impugn all LEIN checks based on "the possibility and the reality of errors in the computer databases accessed by [LEIN-type] systems" amounts to pure speculation and is no way relevant to whether one has an expectation of privacy.

any previously-unobtainable information; it simply allows them to access information more quickly. As the information was obtained without intruding upon a constitutionally-protected area, there was no "search" for Fourth Amendment purposes.

Every court that has addressed this issue has reached the same conclusion. The Tenth Circuit has held on two occasions that license plates are "in plain view on the outside of the car" and thus, are "subject to seizure" because there is no reasonable expectation of privacy. *United States v. Matthews*, 615 F.2d 1279, 1285 (10th Cir. 1980); *see also United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989). The Fifth Circuit has also held that "[a] motorist has no privacy interest in her license plate number." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 529 (5th Cir. 1999); *accord United States v. Sparks*, 37 F. App'x 826, 829 (8th Cir. 2002); *Hallstein v. City of Hermosa Beach*, 87 F. App'x 17, 19 (9th Cir. 2003). The only two panels of this court to address the question have reached the same result. *United States v. $14,000.00 in U.S. Currency*, No. 98-4380, 2000 WL 222587, at *3 (6th Cir. Feb. 14, 2000) (finding no Fourth Amendment violation in a computer check of a license plate); *United States v. Batten*, 73 F. App'x 831, 832 (6th Cir. 2003) (same). As one panel wrote, "[T]here is no case law indicating that there can be any reasonable expectation of privacy in license plates which are required by law to be displayed in public on the front and rear of any vehicle on a public street." *Batten*, 73 F. App'x at 832; *see also* Wayne R. LaFave, 1 Search & Seizure § 2.5(b) (4th ed. 2004) ("[I]t is apparent that when a vehicle is parked on the street or in a lot or at some other location where it is readily subject to observation by members of the public, it is no search for the police to look at the exterior of the vehicle.") (citing *Katz* and *Olabisiomotosho*).

Thus, so long as the officer had a right to be in a position to observe the defendant's license plate, any such observation and corresponding use of the information on the plate does not violate the Fourth Amendment. In this case, Officer Keeley had a right to be in the parking lot observing the van – he was in a public place conducting a routine patrol. The district court's finding that the van was not parked illegally is thus irrelevant – such a finding goes only to probable cause, which is not necessary absent a Fourth Amendment privacy interest.[4] Once Officer Keeley conducted the check and discovered the outstanding warrant, he then had probable cause to pull over the vehicle and arrest the man identified as Ellison. The arrest and resulting search during which the handguns were found in no way violated the Fourth Amendment, and the district court's order granting the motion to suppress was in error.

## IV.

For the foregoing reasons, we vacate the order granting the motion to suppress and remand the case to the district court for further proceedings consistent with this opinion.

---

[4] This court suggested in *$14,000.00 in U.S. Currency* that it would violate the Equal Protection Clause of the Fourteenth Amendment for an officer to run computer checks in an "intentionally racially discriminatory manner." 211 F.3d 1270, 2000 WL 222587 at *3 n.2 (citing *United States v. Travis*, 62 F.3d 170, 174 (6th Cir. 1995)). Ellison makes a brief argument on appeal that racial profiling occurred in this case, and the dissent surmises that Officer Keeley must have had a discriminatory racial motivation because the district court disbelieved his proffered rationale for running the LEIN check. The dissent offers no support for this speculation, however, because the record is completely devoid of any evidence that the officer ran the LEIN check because the driver was black. While the dissent seeks to differentiate between our treatment of this issue and the analysis of the privacy issue, the complete lack of evidence to support a racial profiling argument obviates the need for any further discussion of it.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting.  The majority's decision is a textbook example of a court reaching to resolve an issue that is not properly before it.  The majority opinion highlights how a court can undermine just results by choosing to address an argument — that an officer can run a license plate number through a computer database search without any heightened suspicion — despite its being raised for the first time on appeal without the legal or factual development necessary to resolve the issue.  Because I believe that we cannot consider this matter on a ground raised by the government for the first time here on appeal without contravening this court's longstanding precedent, I respectfully dissent.  I also write to express my concerns regarding the majority's conclusory gloss on the Fourth Amendment issues implicated by the license-plate database search and my disagreement with the majority's analysis of the equal protection claim.

## I. BACKGROUND

On December 31, 2003, Officer Mark Keeley ("Keeley") of the Farmington (Michigan) Police stopped Curtis Ellison's vehicle, in which Ellison was riding as a passenger.  During this stop, firearms were found on Ellison, and he was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).  Ellison moved to suppress the firearms evidence, claiming that the circumstances of the stop violated the Fourth Amendment.  The government claimed that there was probable cause for the stop because the driver of the vehicle, Edward Coleman ("Coleman"), had committed a parking violation.  After a suppression hearing, the district court ruled that Coleman had not committed a parking violation, and thus that the evidence should be suppressed as the fruit of an illegal stop.  On appeal, the government abandoned its argument that there was probable cause to stop the vehicle based upon a parking infraction.  Instead, the government argues, for the first time, that the license-plate database search conducted from the officer's car did not implicate the Fourth Amendment and thus that the stop was independently justified by the information regarding Ellison's outstanding felony warrant that was discovered through the license-plate search.  I will refer to this newly minted Fourth Amendment argument as the "license-plate search argument."

## II. FOURTH AMENDMENT CLAIM

### A.  Consideration of an Argument Raised for the First Time on Appeal

The majority's reaching out to decide this Fourth Amendment question on a basis that the government failed to raise below contradicts legal authority, the interests of justice, and the principle of judicial restraint.  Relying on *Pinney Dock*, the majority decides that the government's argument warrants an exception to the general rule that arguments not raised below will not be considered on the grounds that it raises a purely legal issue that has been "'presented with sufficient clarity and completeness' to ensure a proper resolution" and that "failing to consider the issue would result in a plain miscarriage of justice."  Majority Opinion ("Maj. Op.") at 3 (quoting *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988)).  However, the majority's conclusion misconceives the governing precedent and the nature of the issue before us.

First, in its attempt to fit the license-plate search argument within the parameters of the *Pinney Dock* exception, the majority misapplies *Pinney Dock*.  *Pinney Dock* held that this court generally will not consider issues not addressed below, except for "'exceptional cases or particular circumstances,'" or when adherence to the rule would result in "'a plain miscarriage of justice.'"

838 F.2d at 1461 (quoting *Hormel v. Helvering*, 312 U.S. 552, 557 (1941)) (emphasis added). In *Pinney Dock*, we decided to address the new issue for two reasons: (1) because it was "presented with sufficient clarity and completeness," *and* (2) because "its resolution w[ould] materially advance the progress of this already protracted litigation." 838 F.2d at 1461. Neither of these conditions applies to the government's license-plate search argument. Based on the majority's incomplete view of how the license-plate search implicates the Fourth Amendment, its cursory conclusion that this is a pure legal issue "'presented with sufficient clarity and completeness,'" Maj. Op. at 3 (quoting *Pinney Dock*, 838 F.2d at 1461), may appear correct at first blush. However, once the issue is framed accurately, that is, as a question of not just the plain view of the license plate but also the Fourth Amendment implications of conducting a subsequent search with the license-plate information on the computerized Law Enforcement Information Network ("LEIN"),[1] it becomes clear that there are a multitude of *fact* questions that are essential to the resolution of this issue. For example, to assess properly the Fourth Amendment concerns raised by the use of the LEIN system, any court would need to know what type of information is available on the system; how this information is obtained; who can access the information; what safeguards, if any, are in place to prevent unauthorized access to the information; whether this information was available to police prior to the advent of the mobile data terminal ("MDT")[2]; what the typical police practice is regarding the use of such searches; whether there are any procedures in place to guard against arbitrary searches; what options are available to regulate the use of the technology; what the government's interests are in conducting license-plate searches; what alternative practices could be used to achieve the same ends; the error rates associated with the use of the MDT technology; what practices, if any, are in place to ensure reliability and guard against errors; and the implications that such technology has for racial profiling. There is little to no information in the record on these topics,[3] nor did the parties brief the issue with these concerns in mind, and thus the court is ill-equipped to address the government's newly raised license-plate search argument. That answers to these factual questions are essential to addressing the Fourth Amendment issues implicated by the license-plate search becomes even more clear in the later discussion of the legal and factual assumptions the majority makes regarding the information available from the LEIN search.

Finally, the majority's assertion that "failing to consider the issue would result in a plain miscarriage of justice" because it would "allow[] a conclusion of law to stand that is clearly in error" is also misconceived. Maj. Op. at 3. Because this issue was not raised below, the district court merely stated in passing, without any detailed discussion or analysis, that the use of the LEIN search was improper because Ellison's van was not actually parked illegally. Dist. Ct. Op. at 8. Because both parties assumed that the LEIN check constituted a search for Fourth Amendment purposes, the district court had no occasion to consider the Fourth Amendment issues raised by the LEIN search, and thus its statement cannot be considered a legal conclusion on the matter. Rather, the statement simply highlights that the district court also adopted the parties' assumption, which the court needed

---

[1]This aspect of the license-plate search is addressed more fully in the main text below.

[2]A mobile data terminal ("MDT") is a "remote portable computer" that "enables the transmission of data between the MDT and a host computer system," allowing the police access to a multitude of information about a vehicle and its owner by entering in the vehicle's license-plate number. *See generally* Darlene Cedrés, *Mobile Data Terminals and Random License Plate Checks: The Need for Uniform Guidelines and a Reasonable Suspicion Requirement*, 23 RUTGERS COMPUTER & TECH. L.J. 391, 395-97 (1997). MDTs can access databases such as those maintained by a state's department of motor vehicles and the FBI's National Crime Information Center ("NCIC"). *Id.* at 396. The information accessible by a license-plate search using an MDT can include the vehicle's registration information and the driver's name, address, social security number, license status, prior arrests, convictions, outstanding warrants, and even age, physical characteristics, and race. *See id.* at 396-97; *New Jersey v. Donis*, 723 A.2d 35, 36 (N.J. 1998).

[3]Although there is a brief exchange at the suppression hearing regarding the information that Keeley obtained from the LEIN system, J.A. at 94-97 (Keeley Hr'g Tr. at 61-64), it is insufficient to analyze the Fourth Amendment issues implicated by the license-plate search.

to do to address the narrow issue before it, i.e., whether a parking violation had occurred. Therefore, no "plain miscarriage of justice," would result from us declining to address this issue. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 886 n.11 (1975) (refusing to address "after-the-fact justification" for a search that was not clearly raised below). Despite having the opportunity to respond to this point, the majority makes no attempt to clarify its argument and merely clings to the unfounded assertion that an erroneous legal conclusion would stand were this court not to address the license-plate search argument. Given that no erroneous legal conclusion would be left standing were this court to decline to consider the license-plate search argument presented initially to us by the government, it would be a greater "miscarriage of justice" for this court to address this issue prematurely, without the legal and factual development necessary to resolve it. The majority's willingness to consider the license-plate search argument without fully contemplating the legal and factual questions it raises emphasizes the gaps in the majority's reasoning and the reach of its approach.

## B. Merits of the Fourth Amendment Claim

Although I believe that the government's license-plate search argument is not properly before this court and thus should not be considered, the majority's decision compels me to highlight the shortcomings of its woefully incomplete Fourth Amendment analysis. The majority rests its conclusion that the Fourth Amendment was not implicated by the LEIN search on the relatively uncontroversial fact that the operator of a vehicle has no privacy interest in the particular combination of letters and numerals that make up his license-plate number, but pays short shrift to the crucial issue of how the license-plate information is used. Based on this half-conceived understanding of the issues presented by the LEIN search, the majority then unconvincingly pins its conclusion on *New York v. Class*, 475 U.S. 106 (1986), which deals only with the physical search of the interior of a car to determine a VIN number and does not address the issue of the use of such a number to ascertain other information associated with the vehicle or its operator.[4] This approach misses the crux of the issue before the court: even if there is no privacy interest in the license-plate number per se, can the police, without any measure of heightened suspicion or other constraint on their discretion, conduct a search using the license-plate number to access information about the vehicle and its operator that may not otherwise be public or accessible by the police without heightened suspicion?

Although neither the posture of this issue nor the record before us allows for consideration of the Fourth Amendment implications raised by the LEIN search, it is worthwhile to spell out some of the Fourth Amendment concerns that the use of such technology raises, as no court of appeals has yet done so. The use of a computer database to acquire information about drivers through their license-plate numbers without any heightened suspicion is in tension with many of the Fourth Amendment concerns expressed in *Delaware v. Prouse*, 440 U.S. 648, 655-63 (1979) (cited with

---

[4]Therefore, *Class* is not controlling on the question before this court, and the outcome in this case is governed by no prior precedent. The only other cases cited by the majority are decisions of our sister circuits and the unpublished opinions of this court, each of which is considered only insofar as it is persuasive. None of these cases relied on by the majority is persuasive. In one such case, the license-plate information there was not run through a computer system. *United States v. Matthews*, 615 F.2d 1279, 1285 (10th Cir. 1980). In another case, which is unpublished, the court was faced with a question similar to the one here, but the analysis was inadequate, resting only on the conclusion that there is no privacy interest in the license-plate number without providing any Fourth Amendment analysis regarding the information's further use in the computer search system. *See United States v. Sparks*, 37 F. App'x 826, 829 (8th Cir. 2002). The remaining courts of appeals opinions, two of which are unpublished, address the crucial question of the use of the license-plate information to conduct an additional search in just one sentence and without citation to any authority. *See United States v. $14,000 in U.S. Currency*, No. 98-4380, 2000 WL 222587, *3 (6th Cir. Feb. 14, 2000); *Hallstein v. City of Hermosa Beach*, 87 F. App'x 17, 19 (9th Cir. 2003); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 529 (5th Cir. 1999); *United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989). The perfunctory and conclusory treatment of the issue leaves these cases devoid of any ability to persuade.

approval in *Whren v. United States*, 517 U.S. 806, 817-18 (1996)).  In *Prouse*, the Supreme Court held that an officer may not stop a vehicle to check the operator's license and registration without "at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law," despite the fact that the state requires drivers to be licensed and vehicles to be registered. 440 U.S. at 663.  The Court stated that the Fourth Amendment aims "to safeguard the privacy and security of individuals against arbitrary invasions. . . . Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."[5] *Id.* at 654 (internal quotations and citations omitted).  The Court then explained the constitutional concerns that flow from the unbridled discretion associated with permitting random searches of drivers' information:

> To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . ." *Terry v. Ohio*, 392 U.S. [1], at 22 [1968]. . . . When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations — or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered — we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver.  This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent. . . .

> An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation.  Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities.  Many people spend more hours each day traveling in cars than walking on the streets.  Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel.  Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed.

*Id.* at 661-63.

Although the license-plate search at issue here is arguably less invasive than a license-and-registration check, the constitutional concerns regarding abuse of discretion do not disappear simply because drivers are not stopped to conduct the license-plate search.  First, a search can implicate the Fourth Amendment even when the individual does not know that she is being searched.[6] *Katz v. United States*, 389 U.S. 347, 357-59 (1967).  Second, the balancing of Fourth Amendment interests

---

[5] The Court later explained that such a balancing analysis for Fourth Amendment claims is appropriate where the search or seizure was not justified by probable cause or was "conducted in an extraordinary manner."  *Whren*, 517 U.S. at 817-18.  A balancing analysis is proper for this claim because the LEIN search was conducted without probable cause.

[6] Therefore, the attempt by two of our sister circuits to justify license-plate searches on the basis that unless the search results in suspicious information, the subject of the search "remains unaware of the check and unencumbered," *Walraven*, 892 F.2d at 974; *Olabisiomotosho*, 185 F.3d at 529, is unavailing.

also requires consideration of "psychological intrusion[s] visited upon" the individuals searched in assessing the extent of intrusion that a particular police practice imposes. *See Prouse*, 440 U.S. at 657. The psychological invasion that results from knowing that one's personal information is subject to search by the police, for no reason, at any time one is driving a car is undoubtedly grave. *See* Sam L. Amirante, *People v. Barnes — George Orwell's* 1984 *Revisited: Unbridled and Impermissible Police Use of Computer Power in the Modern Age*, 28 LOY. U. CHI. L.J. 667, 676-77 (1997); Darlene Cedrés, *Mobile Data Terminals and Random License Plate Checks: The Need for Uniform Guidelines and a Reasonable Suspicion Requirement*, 23 RUTGERS COMPUTER & TECH. L.J. 391, 405 (1997).

Because the government incorrectly limits its Fourth Amendment analysis to the plain view of the license plate without exploring the constitutional implications of the subsequent LEIN search, it does not provide any explanation as to the governmental interests promoted by license-plate searches. However, the government's potential interest in law enforcement would not, without more, justify the intrusion, as "[t]he needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973).[7] Nor could an interest in public safety alone legitimate the practice of random license-plate searches. In *Prouse*, the Supreme Court held that the suspicionless license-and-registration check was an "[in]sufficiently productive mechanism" to support the government's asserted interest in public safety because it provided little benefit beyond "[t]he foremost method of enforcing traffic and vehicle safety regulations . . . , acting upon observed violations[,]"and thus the additional intrusion into drivers' privacy was not justified. 440 U.S. at 659. Therefore, the Court concluded that "[t]he marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure — limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable — at the unbridled discretion of law enforcement officials." *Id.* at 661.

In addition, the possibility and the reality of errors in the computer databases accessed by MDT systems lead to great concern regarding the potential for license-plate searches to result in unwarranted intrusions into privacy in the form of stops made purely on the basis of incorrect information. *See* Albert J. Meehan & Michael C. Ponder, *Race and Place: The Ecology of Racial Profiling African American Motorists*, 19 JUST. Q. 399, 407 n.8 (2002) (stating that MDT "error is particularly serious, since evidence suggests that the 'benefit of the doubt' in questionable circumstances is usually given to the computer," and "fewer than half the 50 states require updating criminal history files to include dismissals and acquittals," "only 13 states require random audits to ensure accuracy," but "all the states require the entry of arrests"); Cedrés, at 401-02 (noting that "much of the information contained in public databases is inaccurate or outdated"). Although more data is necessary to assess the rate of errors using license-plate searches, this has been raised as a serious concern by a number of justices in *Arizona v. Evans*, 514 U.S. 1 (1995), which considered whether the exclusionary rule applied to contraband discovered during an arrest resulting from

---

[7]        "These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government."

*Almeida-Sanchez*, 413 U.S. at 274 (quoting *Brinegar v. United States*, 338 U.S. 160, 180 (Jackson, J., dissenting)).

erroneous information derived from an MDT search.[8]  Justice Ginsburg discussed the dangers associated with the use of MDT technology:

> Widespread reliance on computers to store and convey information generates, along with manifold benefits, new possibilities of error, due to both computer malfunctions and operator mistakes.  Most germane to this case, computerization greatly amplifies an error's effect, and correspondingly intensifies the need for prompt correction; for inaccurate data can infect not only one agency, but the many agencies that share access to the database.  The computerized data bases of the Federal Bureau of Investigation's National Crime Information Center (NCIC), to take a conspicuous example, contain over 23 million records, identifying, among other things, persons and vehicles sought by law enforcement agencies nationwide. . . . NCIC information is available to approximately 71,000 federal, state, and local agencies. . . . Thus, any mistake entered into the NCIC spreads nationwide in an instant.

> Isaac Evans' arrest exemplifies the risks associated with computerization of arrest warrants.  Though his arrest was in fact warrantless[,] . . . the computer reported otherwise.  Evans' case is not idiosyncratic.

*Id.* at 26-27 (Ginsburg, J., joined by Stevens, J., dissenting on the basis of whether there was an independent and adequate state law ground for the state court's decision) (citations omitted); *see also id.* at 17-18 (O'Connor, J., joined by Souter & Breyer, JJ., concurring) (asserting that the police's reliance on "powerful, computer-based recordkeeping systems that facilitate arrests" places on the police "the burden of corresponding constitutional responsibilities," including implementing a "mechanism to ensure [the recordkeeping system's] accuracy"); *id.* at 22-23 (Stevens, J., dissenting) (emphasizing "that computer error poses . . . [an] appreciable threat to Fourth Amendment interests," and expressing outrage at the notion of arrests resulting from computer error).  Although these computer databases are used for a variety of purposes, allowing the information contained therein to form the basis for a seizure without *any* other heightened suspicion, let alone probable cause, compounds the risk of privacy intrusions that errors in these databases impose.  The majority's hasty approach to the license-plate search argument without the necessary legal and factual development is all the more inappropriate in the face of these serious countervailing constitutional concerns.

In attempting to counter the Fourth Amendment concerns raised by the use of suspicionless license-plate searches, the majority repeatedly asserts facts and states legal principles that are entirely unsupported.  For example, the majority states that there is "no privacy interest in the information retrieved by Officer Keely.  The obvious purpose of maintaining law enforcement databases is to make information, such as the existence of outstanding warrants, readily available to officers carrying out legitimate law enforcement duties." Maj. Op. at 4.  The majority offers nothing to support these assertions.  Indeed, given that the district court properly found that there was no probable cause to stop the vehicle based upon a parking infraction, it cannot be said that the officers were "carrying out legitimate law enforcement duties."  The majority then relies on these unsupported statements to assume that all of the information retrieved from the LEIN search is "non-private." *Id.*  The only support the majority offers here is a footnote mentioning — but explicitly not relying on — a website of the Michigan State police.  However, as explained earlier, there is minimal evidence in the record and no explanation in the briefs as to what information is available from the LEIN search, and we simply do not know who ordinarily has access to the information

---

[8]The Court in that case had no occasion to consider the constitutionality of the use of MDT technology to conduct random license-plate searches because the stop in that case was justified by a traffic violation and the MDT search was conducted after Evans was stopped and told the officer that his license was suspended. *See Evans*, 514 U.S. at 4.

retrievable from the LEIN search. The majority also asserts that "[t]he technology used in this case does not allow officers to access any previously-unobtainable information; it simply allows them to access information more quickly." Maj. Op. at 5. The majority makes no effort to support this assertion, and there is no evidence in the record regarding the sort of information accessed from a license-plate search using an MDT as compared to the information accessible to the police prior to the advent of this technology. Again, the majority's assumption contravenes the available information, which suggests that the MDT technology transformed, in practice, the amount and nature of information accessed by the officer in the field. *See* Meehan & Ponder, at 406-07; Cedrés, at 397-98. These unresolved factual questions are precisely why we should not, and indeed cannot, address this newly raised issue for the first time on appeal.

The majority also makes legal assumptions that are without any authority. The majority does not explain its assertion that the LEIN search only permits officers to access already accessible information more quickly, let alone does the majority specify through which procedure the police are permitted to access this information or provide any legal authority to support the conclusion that these other unspecified procedures do not implicate the Fourth Amendment. The majority simply presumes, without any analysis or citation to authority, that the information that is accessible through a LEIN search is otherwise available to the police without any heightened suspicion. The New Jersey Supreme Court, in addressing a challenge to random MDT searches as violative of the New Jersey Constitution, held that suspicionless searches using MDTs gave police unwarranted access to private information and thus that the MDTs must be reprogrammed so that officers could only access personal information if the officer's inquiry revealed a reason for further police action, for instance, if the vehicle had been reported stolen. *Donis*, 723 A.2d at 40. The New Jersey Supreme Court therefore acknowledged that there was a privacy interest in the information that police could obtain through an MDT search: the court stated that "[w]ith the reprogrammed MDTs, police officers who were using MDTs at random and who lacked suspicion could access only *non-private* information." *Id.*; *see also* Kevin C. Wille, *State v. Donis: The New Jersey Supreme Court Turns Its Back While Police Conduct Random Mobile Data Terminal Searches*, 17 J. MARSHALL J. COMPUTER & INFO. L. 1235, 1252 (1999). As the New Jersey Supreme Court makes clear, mere prevalence of a practice is insufficient to support its constitutionality, particularly when the practice has not been challenged. *See Donis*, 723 A.2d at 40.

In sum, in light of these significant Fourth Amendment concerns outlined above, it is wholly unwise to reach out to address the government's newly minted license-plate search argument and to decide the issues as the majority has done. I would leave the question to be resolved in a case where it is properly raised, developed with supporting evidence, and briefed and resolved first in the district court.

## III.  FOURTEENTH AMENDMENT RACE DISCRIMINATION CLAIM

Ellison argues that even if the license-plate search did not violate his Fourth Amendment rights, it would violate his right to equal protection if the officers conducted the license-plate search because he is black.[9] Police crime-detection activity that does not implicate the Fourth Amendment can violate the Equal Protection Clause of the Fourteenth Amendment if that activity is motivated by race. *See Farm Labor Organizing Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th

---

[9]It is appropriate for us to consider this argument even if Ellison did not raise it below. "[T]he general rule . . . that a federal appellate court does not consider an issue not passed upon below . . . applies to a party seeking reversal." *Pinney Dock*, 838 F.2d at 1461 & n.16. "'The prevailing party may . . . assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court.'" *Id.* at 1461 n.16 (quoting *Dandridge v. Williams*, 397 U.S. 471, 475 n.6 (1970)). On this basis, we have previously held that an appellee can raise an argument in support of the judgment that was not raised below. *W.G. Fairfield Co. v. Occupational Safety & Health Review Comm'n*, 285 F.3d 499, 504 (6th Cir. 2002).

Cir. 2002); *United States v. Avery*, 137 F.3d 343, 352-53 (6th Cir. 1997); *United States v. Travis*, 62 F.3d 170, 173-74 (6th Cir. 1995). This court has held that a consensual search, which itself does not violate the Fourth Amendment, violates the Equal Protection Clause if it was initiated on the basis of race. *Travis*, 62 F.3d at 173-74. We extended this Fourteenth Amendment protection to an officer's decision regarding whom to target for surveillance, explaining that "[c]itizens are cloaked at all times with the right to have the law applied to them in an equal fashion — undeniably, the right not to be exposed to the unfair application of the laws based on their race." *Avery*, 137 F.3d at 353. Just as "all individuals possess the constitutional right to equal protection as they walk through America's airports," so too do individuals possess the right to equal protection as they operate cars on America's thoroughfares. *Id.* at 353-55. An unpublished opinion of this court recognized the application of the Equal Protection Clause to the circumstances now before us: license-plate searches conducted on the basis of race. *See United States v. $14,000.00 in U.S. Currency*, No. 98-4380, 2000 WL 222587, at *3 n.2 (6th Cir. Feb. 14, 2000).

The majority rejects Ellison's constitutional race discrimination claim because, in its view, "the record is completely devoid of any evidence that the officer ran the LEIN check because the driver was black." Maj. Op. at 5 n.4. This assertion ignores circumstantial evidence in the record that Keeley may have zeroed in on Ellison because of his race and our prior admonition that "[o]ften it is difficult to prove directly the invidious use of race," and thus "'an invidious discriminatory purpose may often be inferred from the totality of the relevant facts. . . .'" *Avery*, 137 F.3d at 355 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

Keeley's asserted reason for running the LEIN check on Ellison, the parking violation, was found to be untrue by the district court. Dist. Ct. Op. at 7-8. While Keeley claimed that the van was blocking a fire lane and blocking traffic, Keeley testified that he took no action to notify the driver of the van of this civil infraction to rectify the situation. J.A. at 77 (Keeley Hr'g Tr. at 44). Although Keeley claimed that he took no action because "at times people drop people off and they quickly get in, get back into the vehicle or proceed to the nearest parking location," J.A. at 78 (Keeley Hr'g Tr. at 45), this also conveniently allowed Keeley time to run the LEIN search of the van's license plate. If Keeley's concern was the parking violation and the blocked fire lane and traffic, there is no reason why he would not want to try to get the vehicle to move immediately.[10] The implausibility of Keeley's explanation and the district court's finding that he was not credible suggests that there was another motivation for Keeley's actions.

Moreover, Keeley concluded that Coleman, the driver of the van, closely resembled the description of the owner of the vehicle that he obtained from the license-plate search because, as Keeley testified, they had "the same build, black males, approximately the same age." J.A. at 79, 83 (Keeley Hr'g Tr. at 46, 50). However, it was dark outside and Coleman was seated, so Keeley could not have easily seen his build or age. J.A. at 79-80, 146 (Keeley Hr'g Tr. at 46-47, 113). Therefore, the only matching characteristics are race and gender, and this suggests that Keeley was stereotyping on the basis of race. Particular attention should be paid to racial profiling claims where, as here under the majority's view, the police's discretion is unconstrained by a heightened suspicion requirement to target a driver for search. *See, e.g.*, *Pennsylvania v. Mimms*, 434 U.S. 106, 122 (1977) (Stevens, J. dissenting) (warning that "eliminat[ing] any requirement that an officer be able

---

[10]Keeley testified that he had issued parking tickets to others who had committed parking violations in the parking lot where he found Ellison's van. J.A. at 105 (Keeley Hr'g Tr. at 72). It is not clear from the record whether Keeley treated Coleman, the driver of the van, any differently than other drivers who had committed the same type of infraction, as the questions and answers on this subject are opaque. The district court asks Keeley, regarding those to whom he had issued parking tickets, "[a]nd of those people that you drove by, they didn't move and so you waited to see if they would move?" J.A. at 105 (Keeley Hr'g Tr. at 72). Keeley responds in the affirmative and testifies that he stopped them later. *Id.* It is not clear whether "stopped them later" means within the parking lot or after the vehicle left the parking lot, and before or after running a license-plate search.

to explain the reasons for his actions . . . leaves police discretion utterly without limits," which will result in "[s]ome citizens . . . be[ing] subjected to . . . [an] indignity while others — perhaps those with more expensive cars, or different bumper stickers, or different-colored skin — may escape it entirely"); *United States v. Harvey*, 16 F.3d 109, 112-15 (6th Cir. 1994) (Keith, J., dissenting) (discussing how excessive police discretion leads to race-based traffic stops); *United States v. Harvey*, 24 F.3d 795, 796 (6th Cir. 1994) (Keith, J., dissenting from denial of rehearing en banc) (same); *id.* at 798-99 (Jones, J., dissenting from denial of rehearing en banc) (same); David A. Harris, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544 (1997) (same); *cf. Blakely v. Washington,* 542 U.S. 296, 315-16 (2004) (linking, in sentencing context, unfettered discretion to race-based decisionmaking) (O'Connor, J., joined by Rehnquist, C.J., Breyer & Kennedy, JJ., dissenting); *Tuilaepa v. California*, 512 U.S. 967, 991-92 (1994) (Blackmun, J., dissenting) (explaining that "unguided discretion" of jurors risks that the discretion will be exercised on the basis of race); *Batson v. Kentucky*, 476 U.S. 79, 105-06 (1986) (Marshall, J., concurring) (highlighting, in the context of juror selection, how wide prosecutorial discretion can result in racially motivated decisions that are easy to justify on other grounds); *Furman v. Georgia*, 408 U.S. 238, 364-65 (1972) (Marshall, J., concurring) (explaining that "'untrammeled discretion'" of jury in determining application of death penalty leads to decisions made on the basis of race (quoting *McGautha v. California*, 402 U.S. 183, 207 (1971))).

The government does not respond to Ellison's racial profiling claim. Officer Keeley testified that he conducted the LEIN check on Ellison's vehicle because "the vehicle was parked illegally." J.A. at 49 (Hr'g Tr. at 16). However, the district court found that Ellison's vehicle was *not* parked illegally, and the government does not appeal this finding. Because this asserted reason for the LEIN search was discredited and indeed rejected by the district court, the government's race-neutral reason drops away, and Ellison's circumstantial evidence supports the inference that race motivated Officer Keeley's decision to conduct a LEIN search on the vehicle. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (explaining that "we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons," and thus, after a prima facie case of discrimination has been made, "when all legitimate reasons for [a given action] have been eliminated as possible reasons for the [action], it is more likely than not the [decisionmaker], who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race"). Ellison has presented sufficient evidence in support of his racial profiling claim to warrant a remand to the district court to conduct an evidentiary hearing on this matter.

## IV. CONCLUSION

Because courts are governed by the principle of judicial restraint, I would decline to consider the government's Fourth Amendment argument raised for the first time on appeal and would affirm the district court's judgment granting Ellison's motion to suppress on the basis of the district court's credibility determination that no parking violation had occurred. Therefore, I respectfully dissent.