Kevin REYNOLDS, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2010–CA–002192–MR.

Court of Appeals of Kentucky.

Nov. 9, 2012.

Molly Mattingly, Assistant Public Advocate, Frankfort, KY, for appellant.

Jack Conway, Attorney General, Michael J. Marsch, Assistant Attorney General, Frankfort, KY, for appellee.

Before CAPERTON, KELLER, and LAMBERT, Judges.

*OPINION*

CAPERTON, Judge:

Kevin Reynolds appeals from a Boone Circuit Court order denying his motion to suppress evidence that was seized during a "pat-down" search of his person. Reynolds also appeals from the Boone Circuit Court judgment of conviction in which he was assessed court costs. Following a careful review of the briefs, the record, and applicable caselaw, we reverse the Boone Circuit Court order denying suppression and vacate and remand.

On May 11, 2010, the Florence Police Department was notified by Walgreens that two women had been in the store, acting strangely, and had each purchased legal quantities of pseudoephedrine. The police were told that the women exited the store and entered a dark-colored SUV that had several other people inside. Approximately one minute after receiving the call, Officer Michael Geis arrived and found a black SUV with five occupants in the Walgreens parking lot. He parked his police cruiser behind the SUV, leaving enough room for the vehicle to back out of the parking space, and shined a spotlight into the vehicle.

Officer Geis approached the passenger side of the vehicle and informed the occupants that he received a call from Walgreens about suspicious activity. Upon questioning, the driver of the SUV, Leslie Hurston, admitted that she purchased pseudoephedrine. Officer Geis then asked the occupants to exit the car and sit on the curb with their legs crossed. During the suppression hearing, Officer Geis testified that he did not *demand* the occupants exit the vehicle and did not use physical force to remove them.

Officer Geis asked the occupants to give him their names, identification, and criminal histories. At this time, one of the occupants, Joseph Terry, admitted that he had previously been imprisoned for trafficking in methamphetamine. Then, several of the SUV's occupants consented to be searched. While Officer Geis was conducting a consensual search on another passenger, he noticed that Terry and Reynolds were fidgeting. Officer Geis saw Terry transfer something from his shirt to his pants. When Officers Brian Murphy and Sean McKibbin arrived on the scene, Officer Geis informed them that he had also observed Reynolds fidgeting. Upon a search of Terry's person, Officer Geis discovered a bag of marijuana and rolling papers.

At the suppression hearing, Officer McKibbin testified that he decided to search Reynolds, without his consent, when Officer Geis found marijuana on Terry's person. He testified that the search was primarily for safety purposes to ensure that Reynolds did not possess weapons that could be used to harm police or bystanders. During the cursory pat-down search, Officer McKibbin felt a large, softball-sized lump in Reynolds's pants, and above his genitalia. Officer McKibbin testified that the lump felt like a bag containing marijuana. The lump moved down Reynolds's leg and eventually fell on the ground.[1] On the ground, Officer McKibbin found a bag containing large amounts of marijuana, methamphetamine, cocaine,

---

1. There appears from the facts that some manipulation by the officer was necessary for the discovery of the marijuana after it became dislodged from Reynolds's genital area.

Percocet, oxycodone, Lortab, and Valium. Officer McKibbin placed handcuffs on Reynolds, arrested him, and charged him with possession of the aforementioned controlled substances.

On June 1, 2010, a Boone County grand jury indicted Reynolds. On July 2, 2010, Reynolds moved the trial court to suppress the evidence seized as a result of the stop and subsequent pat-down search. The trial court heard the suppression motion on July 22, 2010. In an order, entered on August 27, 2010, the trial court denied Reynolds's motion to suppress and found that, "Reynolds was detained, triggering the requirements of *Terry* [*infra*]. The court finds the officers had articulable facts to support their reasonable suspicion, and that they acted on that reasonable suspicion by detaining the Defendant." The trial court also found that the search of Reynolds's person was reasonable for safety purposes.

On October 14, 2010, Reynolds entered a conditional guilty plea to one count of first-degree possession of a controlled substance, one count of second-degree possession of a controlled substance, one count of possession of marijuana, and one count of being a first-degree persistent felony offender. Per the agreement, the terms of each charge were to run concurrently for a total of one year imprisonment, enhanced to ten years' imprisonment by the persistent felony offender conviction. Reynolds reserved the right to appeal the trial court's ruling on his suppression motion which gives the basis for this appeal.

Upon appellate review, our Court will affirm the trial court's findings of fact if those findings are supported by substantial evidence. Kentucky Rules of Criminal Procedure (RCr) 9.78. We will only examine the trial court's findings for clear error and give deference to reasonable inferences made from the evidence. *Common-*

*wealth v. Whitmore*, 92 S.W.3d 76, 79 (Ky. 2002), quoting *Ornelas v. U.S.*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996). If the court's findings of fact are supported by substantial evidence, we will conduct a *de novo* review of the court's application of the law to the facts. *Commonwealth v. Neal*, 84 S.W.3d 920, 923 (Ky.App.2002).

We agree with the trial court's finding that Reynolds was detained by Officer Geis. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Kotila v. Commonwealth*, 114 S.W.3d 226, 232 (Ky.2003), citing *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). A detention or seizure is generally determined, in light of the surrounding circumstances, by whether a reasonable person would have felt free to leave. *Commonwealth v. Lucas*, 195 S.W.3d 403, 405 (Ky.2006). "A seizure occurs when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Taylor v. Commonwealth*, 125 S.W.3d 216, 219 (Ky.2004).

Reynolds claims that he was not free to leave when Officer Geis asked him to exit the SUV and sit on the curb. Factors indicative of restraint on liberty include, "the threatening presence of several officers, physical touching of the person, or use of a tone or language that might compel compliance with the request of the police." *Lucas* at 405–06. Although it did not block the SUV, Officer Geis's police cruiser was parked behind the vehicle. The police cruiser's bright spotlight was activated and pointed into the SUV. Officer Geis testified that the passengers were asked to exit the vehicle and to sit on the curb with their legs crossed. Certainly, this raises concern with respect to the

factors indicative of restraint enumerated above.

■ Ultimately, this case presents issues of both search and seizure. "Whether a seizure is reasonable requires a review of the totality of the circumstances, taking into consideration the level of police intrusion into the private matters of citizens and balancing it against the justification for such action." *Baker v. Commonwealth*, 5 S.W.3d 142, 145 (Ky.1999). A seizure does not require a showing of probable cause that a crime was committed. *Nichols v. Commonwealth*, 186 S.W.3d 761, 763 (Ky.App.2005). Furthermore, "the level of articulable suspicion necessary to justify a stop is considerably less than proof of wrongdoing by preponderance of the evidence." *Commonwealth v. Banks*, 68 S.W.3d 347, 351 (Ky.2001). In order to justify a stop, police must only have reasonable suspicion of criminal activity afoot. *Terry*, 392 U.S. at 30, 88 S.Ct. at 1885. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Kotila v. Commonwealth*, 114 S.W.3d 226 at 232, citing *Terry v. Ohio*, 392 U.S. at 16, 88 S.Ct. at 1877.

In *Nichols v. Commonwealth*, 186 S.W.3d 761 (Ky.App.2005), a case factually similar to the case at hand, our Court concluded that reasonable suspicion existed when Nichols purchased pseudoephedrine while exhibiting nervous, strange behavior. *Id.* at 764 –65. The Court concluded,

> The facts of this case present a close question because, like the facts in *Terry*, the suspicious act viewed alone appears as consistent with legal as with illegal activity. We believe that the purchase of a large amount of pseudoephedrine, together with the rational inferences that a trained police officer would make

as a result of the purchase, justified a brief investigatory stop.

*Id.*

■ Certainly the approach by the officer to the vehicle based on the report of the purchase of pseudoephedrine by two women, acting strangely, who subsequently exit the store and together enter the same vehicle and were apparently acting in concert, justifies a brief investigatory stop so the officer may attempt to ascertain the circumstances surrounding the purchase. *See Nichols, supra*. However, whether reasonable articulable suspicion existed in this case for the actions of the officers in continuing the detention of Reynolds beyond the initial stop need not be decided because of our decision to analyze the search of Reynolds, which we view as the dispositive issue. Our analysis now shifts to the pat-down search of Reynolds.

In *Owens v. Commonwealth*, 291 S.W.3d 704 (Ky.2009), our Supreme Court adopted the automatic companion rule and upheld a pat-down search of a passenger of a vehicle when the vehicle's driver has been arrested for illegal narcotics despite no independent suspicion that the passenger was guilty of criminal conduct. However, in doing so, our Supreme Court stated:

> We are not unmindful of the powerful protections afforded by the Fourth Amendment. *In no sense should our holding in this case be taken as a license for law enforcement officers to believe that all frisks of all persons are always proper. We also reject any implication that our holding creates a "guilt by association" mentality.* To the contrary, our holding is simply an avenue to protect the officer working at the point of contact and the public. Toward that end, our holding is a limited and narrow exception to the exclusionary rule, designed to apply only in situations in which the driver of a vehicle has

been lawfully arrested and the passengers of the vehicle have been lawfully expelled in preparation for a lawful search of the vehicle. Only in those limited circumstances, which are fraught with danger for officers and bystanders alike, may an officer conduct a brief pat-down for weapons (not a full-blown search) of the vehicle's passengers, regardless of whether those passengers' actions or appearance evidenced any independent indicia of dangerousness or suspicion.

*Owens* at 712 (emphasis supplied).

Thus, while our Supreme Court has adopted the automatic companion rule, it explicitly held its application to the factual scenario where the driver of the vehicle had been arrested and the vehicle is being lawfully searched. This is not consistent with the facts *sub judice*. Accordingly, any search conducted of Reynolds must be analyzed under caselaw requiring individualized behavior justifying reasonable suspicion that he was armed and dangerous.

 Accordingly, "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a pat-down search "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24, 88 S.Ct. at 1881.

During the investigatory stop, the officer discovered that one of the individuals had a prior criminal record for trafficking in methamphetamine. The officer then commenced to conduct searches of the individual occupants of the vehicle based on consent. At this point, Officer McKibbin arrived on the scene. He was told that Reynolds was fidgeting about his person prior to his arrival. Prior to the search of Reynolds, in the presence of Officer McKibbin, "something" was discovered on another individual being searched. Officer McKibbin then knew that Reynolds had been fidgeting about his person and that something was discovered on another occupant of the vehicle. Officer McKibbin knew that he was an occupant of an SUV that was also occupied by two female passengers who had both recently purchased pseudoephedrine while acting strangely, and that Terry, another passenger, had a criminal history that included trafficking in methamphetamine. Further, an officer had observed Reynolds fidgeting while sitting on the curb.

 While many facts are known to the officer, we must remember that the scope of the pat-down search is limited to only that investigation necessary to discover weapons that may be used to harm the officers or bystanders. *Commonwealth v. Crowder*, 884 S.W.2d 649 (Ky.1994). Of these facts, the only fact that gives any weight in support of a non-consensual pat-down search of Reynolds based on individualized suspicion that he could be armed and dangerous is the fact that Reynolds was fidgeting prior to Officer McKibbin's arrival.

Of import is the case of *Commonwealth v. Whitmore*, 92 S.W.3d 76, wherein our Supreme Court found justification for a *Terry* search where:

The officer was a police liaison in the housing project which was in a high crime and drug trafficking area. She had been to the apartment, where Whitmore was staying, numerous times before and had seen weapons there. When the officer entered the apartment, Whitmore began fidgeting and turning away from her. He then gave the officer a false name and refused to remove his hand from his pocket upon request. Considering the totality of the circum-

stances, the police officer had sufficient facts to form a reasonable belief that Whitmore was armed and that she was entitled to conduct a protective pat down search.

*Whitmore* at 92. Therein, the suspect was fidgeting, present in a high crime area known for drug trafficking, gave a false name and, importantly, known on numerous times to be in the presence of weapons and refused to remove his hand from his pocket when instructed to do so by the officer. Of these facts, fidgeting is the only common fact between the two cases. Therefore, we conclude that fidgeting alone is insufficient to justify a *Terry* search for weapons. Accordingly, we reverse.

█ Finally, we address Reynolds's claim that the trial court erred in assessing court costs to an indigent defendant. Recently, in *Maynes v. Commonwealth*, 361 S.W.3d 922 (Ky.2012), the Kentucky Supreme Court held that "there is no prohibition on imposition of court costs on a defendant who qualifies for the services of a public defender if the trial court determines under the circumstances of that particular case that the defendant is able to pay such costs." *Id.* at 923. Of import, the *Maynes* Court distinguished prior cases, like *Travis v. Commonwealth*, 327 S.W.3d 456, 459 (Ky.2010,) [2] when it stated:

[I]n none of those cases was the defendant's ability to pay made an issue, nor in any of them was the recoupment statute invoked. Without some reasonable basis for believing that the defendant can or will soon be able to pay, the imposition of court costs is indeed improper. Here, by contrast Maynes was to be released from custody pursuant to

his diversion agreement, and so, unlike the defendants in the cases just referred to, he could reasonably be expected in the near future to acquire the means to pay the relatively modest court costs of $130.00.

*Maynes* at 930.

█ Thus, in light of *Maynes,*

Courts may now impose court costs on an indigent defendant, "unless the court finds that the defendant is a poor person as defined by KRS [Kentucky Revised Statutes] 453.190(2) and that he or she is unable to pay court costs and will be unable to pay the court costs in the foreseeable future." KRS 23A.205.

*Smith v. Commonwealth,* 361 S.W.3d 908, 921 (Ky.2012).

Accordingly, we reverse the trial court's imposition of court costs, and remand for a determination of whether Reynolds is: (1) a poor person as defined by KRS 453.190(2); and (2) unable to pay court costs now, and will be unable to pay court costs in the foreseeable future. The Boone Circuit Court's order denying Reynolds's motion to suppress is reversed. The judgment of conviction is vacated and the case is hereby remanded for further proceedings consistent with the opinion.

LAMBERT, Judge, Concurs.

KELLER, Judge, concurs and files separate opinion.

KELLER, Judge, Concurring:

I concur in result only, because I believe that Reynolds was improperly seized.

Having carefully reviewed the July 22, 2010, suppression hearing, I set forth the relevant testimony below. Officer Michael

---

**2.** In *Travis* the Court held: "At the time of trial, both Travis and Dawson were receiving the services of a public defender, and were granted the right to appeal in *forma pauperis.*

They were clearly indigent. Thus, the trial court clearly erred in imposing a fine and court costs upon the Appellants." *Travis* at 459.

Geis (Officer Geis) testified to the following. Around midnight on May 11, 2010, someone from Walgreens notified the Florence Police Department that two women had been in the store, that they were talking loudly and acting strangely, and had purchased legal quantities of pseudoephedrine.[3] There were also some other females involved that purchased pseudoephedrine.[4] The police were told that the two women had recently left the store and entered a dark-colored SUV that had several other people inside. Approximately one minute after receiving the call, Officer Geis arrived and found a black SUV with five occupants backed into a parking space in the Walgreens parking lot. Officer Geis parked his police cruiser perpendicular to the SUV, leaving enough room for the SUV to pull out of the parking space, and shined a spotlight into the SUV.

Officer Geis approached the passenger side of the SUV and noticed that there were two female occupants in the front and three male occupants in the back. Officer Geis then told the occupants about the call from Walgreens and asked if anyone purchased pseudoephedrine. When he did not receive a response, Officer Geis told the occupants that he could go inside Walgreens and ask who purchased the pseudoephedrine. Jennifer Ahlers (Ahlers), the front-passenger-side occupant, then admitted that she purchased pseudoephedrine. A male passenger in the backseat stated that he did not purchase anything.

Thereafter, Officer Geis, who testified that he knew pseudoephedrine is used to manufacture methamphetamine, asked the occupants to get out of the SUV and sit on the curb with their legs crossed. Officer

Geis testified that he did not order the occupants to get out and did not use physical force to remove them. While the occupants were sitting on the curb, Officer Geis asked them to give him their names, identifications, and criminal histories. One of the occupants, Joseph Terry (Terry), admitted that he had previously been imprisoned for trafficking in methamphetamine. Officer Geis noted that, based on Terry's statement, he became suspicious that the pseudoephedrine might be used for illegal purposes. Officer Geis further noted that he was suspicious because Ahlers, who told him that she had purchased the pseudoephedrine because she was sick, did not show any signs or symptoms of illness.

While conducting a consensual search of Ahlers, Officer Geis noticed that Terry and Reynolds were "fidgety" and seemed nervous. Officer Geis saw Terry transfer something from his pocket into the inside of his pants. Upon a search of Terry's person, Officer Geis discovered a bag of marijuana and rolling papers. When Officer Sean McKibbin (Officer McKibbin) arrived on the scene, Officer Geis told him that he had also observed Reynolds "fidgeting" with his hands.

At the suppression hearing, Officer McKibbin testified to the following. After Officer Geis found marijuana on Terry's person, Officer McKibbin decided to search Reynolds, without his consent. The search was primarily for safety purposes to ensure that Reynolds did not possess weapons. During the cursory pat-down search, Officer McKibbin felt a large, softball-sized lump in Reynolds's pants, above his genitalia. Officer McKibbin testified that the lump felt like a bag containing

---

**3.** "Pseudoephedrine is contained in over-the-counter allergy medications and is also an ingredient used in manufacturing methamphetamine." *Lindsey v. Commonwealth,* 306 S.W.3d 522, 523, n. 7 (Ky.App.2009).

**4.** The other females were never identified.

marijuana. When he asked Reynolds what the lump was, Reynolds stated that it was his genitalia. Officer McKibbin testified that he knew it was not part of Reynolds's anatomy. Officer McKibbin then placed Reynolds in handcuffs and noticed that the lump had fallen down Reynolds's leg. Officer McKibbin removed the bag, which contained marijuana, methamphetamine, cocaine, Percocet, oxycodone, Lortab, and Valium.

I believe the crucial question presented in this case is whether Reynolds was improperly seized. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *U.S. v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). When Officer Geis approached the SUV parked in the parking lot of Walgreens and made inquiries, he did not conduct a "seizure" or in any way violate the Fourth Amendment. *See Baltimore v. Commonwealth,* 119 S.W.3d 532, 537 (Ky.App.2003) (stating that "[a] police officer may approach a person, identify himself as a police officer and ask a few questions without implicating the Fourth Amendment"). However, once Officer Geis asked Reynolds to step outside of the SUV, Reynolds was not free to leave and was subject to an investigatory stop or seizure. *Henson v. Commonwealth,* 245 S.W.3d 745, 747–48 (Ky.2008).

Therefore, under the Fourth Amendment, at the time he asked Reynolds to exit the vehicle, Officer Geis had to have a reasonable suspicion, based on objective and articulable facts, that Reynolds was engaged in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1885, 20 L.Ed.2d 889 (1968). To determine whether an officer had such reasonable suspicion, this Court must look at the totality of the circumstances surrounding the seizure. *See Baltimore,* 119 S.W.3d at 539. Further, "[i]n determining the totality of the circumstances, a reviewing court ... must consider all of the [officers'] observations and give due regard to inferences and deductions drawn by [the officers] from their experience and training." *Id.* (Footnote omitted).

I disagree with the Majority's conclusion that there was reasonable and articulable suspicion that criminal activity was afoot and further believe that this case is distinguishable from *Nichols v. Commonwealth,* 186 S.W.3d 761 (Ky.App.2005). In *Nichols,* Wells, an off-duty police officer, was working as a security guard late at night in a Kroger store when he noticed the defendant purchase a large quantity of a cold remedy containing pseudoephedrine. Although he could not remember the exact quantity, Wells believed that the defendant purchased three or more boxes. *Id.* at 762–64.

Wells testified that he knew that pseudoephedrine is used to manufacture methamphetamine and that he would sometimes get a "hunch" about customers who purchased pseudoephedrine. Because he was suspicious of the defendant, he called the police. When a police officer arrived, Wells told the officer he observed the defendant get into a black Camaro after leaving the store. The officer then stopped the Camaro as the defendant started to drive away from the store. The officer told the defendant why he had stopped him and asked for permission to search the vehicle, which the defendant granted. The officer found a marijuana cigarette and three Kroger bags containing ten boxes of pseudoephedrine pills. *Id.*

The defendant filed a motion to suppress all the seized evidence on the grounds that the officer lacked a sufficient legal reason to make the investigatory stop. In con-

cluding that there was reasonable suspicion to justify the stop, this Court noted the following:

In *Terry* the United States Supreme Court recognized that, in determining whether the seizure and search of Terry was unreasonable under the Fourth Amendment, the Court's inquiry "is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." The Court would not approve "intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." The Court aimed instead at an objective standard whereby the courts must inquire whether the "facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate[.]" The facts available to the officer in *Terry* were the officer's observation of Terry and another man as they stood talking on a street corner. Each of the men in turn walked down the street and stood briefly looking into a store window, then returned and talked to the other. This conduct was repeated several times. The Court noted that the series of actions observed by the officer might seem innocent when viewed alone, but "taken together warranted further investigation." In analyzing the reasonableness of an officer's conduct after the fact courts should give due weight not to an officer's mere "hunch", "but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

. . . .

The facts of this case present a close question because, like the facts in *Terry,* the suspicious act viewed alone appears as consistent with legal as with illegal activity. We believe that the purchase of a large amount of pseudoephedrine, together with the rational inferences that a trained police officer would make as a result of the purchase, justified a brief investigatory stop.

*Id.* at 764–65 (citations omitted).

Unlike in *Nichols,* there was not a reasonable suspicion of possible criminal activity sufficient to justify the seizure of Reynolds. In this case, the police received a report from Walgreens that two women, who were acting suspiciously, purchased a legal amount of pseudoephedrine. Besides the report that the women were talking loudly and acting strangely, there was no other testimony at the suppression hearing as to what made the purchase suspicious. Further, there was no testimony that anything that the occupants of the SUV said or did caused Officer Geis to be suspicious when he inquired about the pseudoephedrine. In fact, based on Officer Geis's testimony, he could not have reasonably become suspicious that the pseudoephedrine had been purchased for an illegal purpose until he noticed that Ahlers did not appear to be sick and Terry stated that he had previously been imprisoned for trafficking in methamphetamine. Based on the record, these observations occurred *after* Officer Geis had seized Reynolds, not before. The facts as they existed before the seizure—two women who were talking loudly and acting strangely as they purchased a legal amount of pseudoephedrine—were not sufficient to give rise to a reasonable suspicion of criminal activity. Therefore, Officer Geis's seizure of Reynolds was not justified, and I would reverse for that reason.

Finally, I note that, had Reynolds been properly seized, a pat-down search would have been appropriate.