RENDERED: MARCH 5, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1492-MR

SHEILA WILLIAMS                                                   APPELLANT


                        APPEAL FROM BOONE CIRCUIT COURT
v.                      HONORABLE JAMES R. SCHRAND, JUDGE
                        ACTION NO. 19-CR-00177


COMMONWEALTH OF KENTUCKY                                          APPELLEE


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  ACREE, JONES, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE:  Logan Henry, a Boone County Deputy Sheriff, stopped a vehicle in which Sheila Williams was a passenger solely because a computerized license plate status check directed Henry to see if the vehicle was insured.  Henry asked the driver for proof of insurance and asked all three occupants for identification.  The driver produced proof of insurance, but another passenger was arrested pursuant to a warrant for a probation violation.  Despite the

purposes of the stop having been completed, Henry did not let the vehicle go, and instead repeatedly asked for permission to search it. Williams demurred but her husband eventually relented. Henry discovered a "drug kit" in Williams's purse, which was inside the vehicle during the search. Because Henry impermissibly extended the traffic stop, we reverse the trial court's order denying Williams's motion to suppress.

To understand our decision, we must relate the facts in greater detail than we typically deem necessary. The following facts are primarily drawn from the suppression hearing, at which Henry was the lone witness. Before reciting the facts, we must make some prefatory notations and disclaimers. The entire video footage from Henry's body camera was not played at the hearing.[1] For example, footage of the initial stop of the vehicle was not played. The body camera footage was also not played straight through; instead, it was played in segments, with intervals between those segments devoted to questions by Williams's attorney. Also, the relevant events occurred after dark in a poorly lit area with precipitation falling, so it is sometimes difficult to hear clearly and determine with certainty who is speaking. Knowing who said what is rendered even more difficult since there

---

[1] A DVD marked Suppression Exhibit 2 contains a more complete recording of the stop, though it too seems to be incomplete as it abruptly begins with Henry asking for proof of insurance and identification from the vehicle's occupants. Because Exhibit 2 nonetheless provides a more complete picture of the stop, and also has less muffled/garbled audio than did the snippets played at the hearing, we will often refer to it herein.

were other officers present, but they did not testify, and their identities were not discussed at the suppression hearing. Henry admitted at the suppression hearing that it is sometimes "very difficult to understand" what is being said.

In January 2019, Henry performed a "status check" on a vehicle he encountered while on patrol, which in practical terms means he ran the vehicle's license plate number through a computer. The computer told Henry to verify insurance coverage, so he stopped it for that reason alone. Williams's husband was driving; Williams was riding in the front seat and her brother in the rear. Henry asked all three occupants for identification, and all three complied.

Dispatch told Henry that there was an active warrant for Williams's brother for a probation violation related to an underlying heroin charge, so Henry removed the brother from the vehicle and arrested him.[2] Williams had to exit the vehicle in order for her brother to leave it, but she re-entered it, presumably due to the winter weather. As Williams was letting her brother leave the vehicle, Henry asked the occupants if there was "anything in the car I need to know about," to which Williams responded simply, "No." The deputy again asked, "Nothing at all?" and Williams again responded, "No." At some point during the stop, Henry learned

---

[2] Exhibit 2 permits us to calculate that Henry directed Williams's brother to leave the vehicle about seven and a half minutes after asking for identification and proof of insurance.

Sheila Williams had pending drug charges in Kenton County, Kentucky.[3]  In the course of effectuating the arrest, Henry asked Williams's brother several questions, including whether there were drugs in the car.  Williams's brother responded in the negative.

After Williams's brother was secured, Henry returned to Williams's vehicle and ordered Williams to exit it, without explaining why.[4]  Henry yet again asked her if there was "going to be anything in that vehicle"; Williams yet again answered in the negative.  Williams explained the driver was her husband, the car was theirs, and the arrestee was her brother.

Henry told Williams that her brother had a warrant for his arrest for a probation violation related to a possession-of-heroin charge.  Henry then asked Williams if she or her husband would "have a problem if I took a look in the car, just to make sure that there's nothing illegal in it?"  Williams did not respond for several seconds, then nonreponsively mentioned they had "all of our clothes and

_____

[3] At the suppression hearing, Henry testified that he thought he learned of Williams's pending charges from his computer search, not from dispatch.  Nonetheless, the Commonwealth contends in its brief that dispatch can be heard telling Henry of Williams's pending charges during the body camera footage played at the suppression hearing.  We cannot discern what dispatch told Henry with reliable precision.  Regardless, the outcome of this case is not impacted by how Henry learned of Williams's pending charges.

[4] Exhibit 2 shows that request occurred about four minutes after Henry directed Williams's brother to exit the car, and about eleven and a half minutes after Henry asked for proof of insurance and identification.  It is difficult to discern with complete assurance what Henry said to Williams to get her to exit the vehicle, but it sounds something like, "You wanna jump out for me."

-4-

everything" in the car. Henry again asked Williams if there "was going to be anything in it" and she, once again, said no. Henry then asked if they "have a problem" with him searching the car because Williams's brother had a "warrant for heroin."

Williams's husband stated something to the effect that the warrant was not for him, whereupon Henry again asked if he could search the car. Williams's husband asked why they had to "go through all that for," and Henry responded that he wanted to search the car to see if Williams's brother put anything "heroin-related" in it since he was an "admitted heroin user" and had "previous heroin charges." Williams's husband's response is not wholly discernible, but it sounds like he told Henry that he could "look back there in the backseat where he [Williams's brother] was sitting or whatever." Henry then asked Williams's husband what was "gonna be in here" and her husband said "nothing."

Henry soon thereafter curiously said he was asking to try to help Williams's brother because he was on probation, though Henry did not explain how searching the vehicle would logically help Williams's brother. Henry again said that since there had been someone with a warrant "in relation to heroin" in the vehicle, he wanted to search the vehicle to make sure Williams's brother had not placed anything in it related to heroin or other drugs. Williams's husband then

apparently gave consent for the search, but exactly what he said to Henry to give consent is not discernible.[5]  Only then did Henry tell Williams's husband to exit the vehicle.  Henry later testified that he believed the consent to search encompassed "all contents of the vehicle."

Henry shined his flashlight on objects in the driver's side of the vehicle, which are not immediately recognizable in the video, and asked Williams's husband if they were marijuana roaches.  His response is indistinct. Henry then asked if the presence of marijuana was why they did not want to let him in the car at first,[6] and Williams's husband said, "Well, basically."  Henry then asked if there was any "weed" in the car and said, "Trust me, I am not out here looking for a little bit of personal use weed."  Williams's husband admitted there might be a "dime"[7] of marijuana in the center console.  Henry then resumed searching.

---

[5] From viewing Suppression Exhibit 2, we can discern that Williams's husband granted permission for the search approximately:  fourteen and a half minutes after Henry first asked for identification and proof of insurance; seven minutes after Henry told Williams's brother to exit the vehicle; and three minutes after Henry asked Williams to exit the car.  In short, Henry asked for permission multiple times over the course of roughly three minutes before finally receiving it.

[6] That comment is difficult to reconcile with Henry's testimony at the suppression hearing that he had not thought at the time that Williams and her husband initially did not want him to search the vehicle.

[7] Although not explored at the hearing here, precedent contains a reference to testimony indicating that "a 'dime bag' is the street term for ten dollars worth of marijuana." *Howell v. Commonwealth*, 163 S.W.3d 442, 446 n.1 (Ky. 2005).

Soon thereafter, Henry exclaimed, "Huh, what do you know? We got a full kit in here. Alright, let's talk to her." The video does not show the items to which Henry is referring as it does not depict the search of the purse, but he later testified that a "kit" refers to items used to abuse drugs. It is uncontested that Henry did not separately ask permission from Williams before searching the purse. Henry then asked who the purse belongs to but then said he could "take a wild guess at whose it is." Although not explained, Henry's "wild guess" was logically premised upon Williams having been the lone female occupant of the vehicle, especially since he had already remarked "let's talk to her" upon finding the drug kit. Henry arrested Williams soon thereafter.

Williams was indicted for two counts of possession of a controlled substance in the first degree (one for heroin and one for cocaine) and for misdemeanor possession of drug paraphernalia. She later filed a motion to suppress the evidence seized from her purse, arguing only that her husband lacked the authority to grant permission for a search of her purse and that the arrest of her brother had not given Henry the right to search her purse.

In its post-hearing written response, the Commonwealth conceded that the search "was not done as part of a search incident to arrest" Williams's brother. Instead, the Commonwealth argued that Williams's husband's consent for the search was "unlimited," and Williams had not revoked it. Alternatively, the

Commonwealth argued Henry had probable cause to search Williams's purse based upon: Williams's brother's prior controlled substance conviction, Williams and her husband having lied about whether the vehicle contained contraband, and the presence of marijuana in the console of the vehicle "very close to" Williams's purse.

In its order denying Williams's motion to suppress, the trial court found that Henry asked Williams's husband "approximately 5 times" before the husband gave consent for the search, though the court concluded the consent was voluntarily given. The court agreed that the arrest of Williams's brother did not provide a valid basis to search Williams's purse. The court also agreed with Williams that her husband lacked common authority over Williams's purse sufficient to consent to a search of it. Ultimately, however, the court agreed with the Commonwealth that the search of the purse was properly based upon probable cause due to: its being in the vehicle, Williams's brother's prior controlled substance conviction, the probation violation-based warrant for the brother's arrest, Williams and her husband having lied about whether the vehicle contained contraband, and the discovery of marijuana near the purse.

Williams then entered into a conditional guilty plea, the terms of which permitted her to appeal the denial of her motion to suppress. *See* Kentucky Rule of Criminal Procedure (RCr) 8.09. Williams was ultimately sentenced to a

total of three years' imprisonment but was placed on probation for three years. She then filed this appeal.

Before we begin our analysis, we must address the discrepancy between the issues Williams raised in the trial court and those she raises here. In the trial court she raised two core issues: 1) her husband lacked the ability to consent to the search of her purse; and 2) the arrest of her brother did not provide Henry with justification to search the vehicle. She raises neither issue here. Instead, before us her two main arguments are: 1) Henry "lacked reasonable articulable suspicion to stop the car based on his running of the license plate"; and 2) "[e]ven if the initial *traffic stop* was legitimate, the officer improperly prolonged it without *any* articulable suspicion."

"Arguments not pursued on appeal are deemed waived." *Garland v. Commonwealth*, 458 S.W.3d 781, 785 (Ky. 2015). Accordingly, Williams has waived the *only* arguments she pursued in circuit court.[8]

---

[8] There apparently is no factually similar, directly applicable Kentucky precedent resolving whether a driver, even a husband, has common authority sufficient to authorize the search of a passenger's bag within a vehicle. Some courts have held that a driver lacks such authority. *See, e.g., State v. Daniels*, 848 N.W.2d 670, 677 (N.D. 2014). Other courts have noted the intensely private nature of a purse. *See*, *e.g.*, *People v. Baker*, 79 Cal. Rptr. 3d 858, 863 (Cal.App. 2008); *Wyoming v. Houghton*, 526 U.S. 295, 308, 119 S.Ct. 1297, 1304, 143 L.Ed.2d 408 (1999) (Breyer, J., concurring). And, although factually distinguishable from this case, there is also some authority holding that a husband lacks the ability to consent to a search of his wife's purse. *State v. Hamilton*, 320 P.3d 142, 152-53 (Wash.App. 2014). However, since Williams has not raised *any argument whatsoever* to us that her husband lacked the authority to authorize a search of her purse, we express no opinion on that interesting issue.

Contrary to Williams's brief, she also did not preserve her newfound arguments. Tellingly, she has not cited, nor have we independently located, where she raised in circuit court the issues she presents here. Instead, as the Commonwealth aptly notes, she substitutes wholly new arguments on appeal, forsaking the ones she raised in circuit court. Though Williams seems to disagree, only the issues actually raised before the trial court are preserved for appellate review, so she preserved only arguments pertaining to the alleged lack of authority of her husband to consent to the search and the alleged lack of authority to search based upon her brother's arrest. Since she raises neither of those issues here, we agree with the Commonwealth that she did not preserve *any* of her appellate issues.

Unpreserved allegations of error may only be reviewed on appeal for palpable error. *See* RCr 10.26. And Williams did ask for palpable error review of any unpreserved errors in her reply brief, which is generally permissible. *Commonwealth v. Jones*, 283 S.W.3d 665, 670 (Ky. 2009). Nonetheless, courts have found palpable error review to be "a constant challenge" because, among other things, "what is palpable error lies in the eyes of the beholder." *Commonwealth v. Rieder*, 474 S.W.3d 143, 147 (Ky. 2015). Conducting palpable error review of arguments in favor of suppressing evidence which were never presented to the trial court is particularly challenging because suppression hearings are closely tied to the arguments raised by a defendant, and a trial court's findings

-10-

are generally narrowly tailored to address those arguments. We are a court of *review* but what Williams argues has never been *viewed*.

Appellate courts are not required to conduct a palpable error review of all unpreserved issues. *See Brank v. Commonwealth*, 566 S.W.3d 560, 566 (Ky.App. 2018) ("Whether to undertake palpable error review is within the sole discretion of the appellate court."). Sometimes we have thus declined to conduct palpable error review of unpreserved suppression arguments. *See*, *e.g.*, *Jones v. Commonwealth*, 239 S.W.3d 575 (Ky.App. 2007). By contrast, we have engaged in palpable error review of unpreserved suppression arguments on other occasions. *See*, *e.g.*, *Boyd v. Commonwealth*, 357 S.W.3d 216, 219 (Ky.App. 2011).

We strongly prefer to resolve appeals on the merits "whenever possible." *C.M.C. v. A.L.W.*, 180 S.W.3d 485, 490 (Ky.App. 2005). That preference should be even more pronounced in criminal cases since a person's liberty is at stake. And here, declining to conduct palpable error review would not be in the best interests of justice because, as a practical matter, it would preclude any review, which would be manifestly unjust because it is plain that Henry improperly extended the stop. Accordingly, we shall conduct a palpable error review.

To show palpable error, Williams must present an error "so grave that, if uncorrected, it would seriously affect the fairness of the proceedings. It should

-11-

be so egregious that it jumps off the page . . . and cries out for relief." *Howard v. Commonwealth*, 595 S.W.3d 462, 476 (Ky. 2020) (citations and internal quotation marks omitted).[9]

Williams first argues Henry "lacked reasonable articulable suspicion to stop the car based on his running of the license plate." Essentially, Williams contends it is improper for an officer to run the license plates of vehicles randomly encountered on patrol through a computer program and then stop the vehicle *solely* because the computer said the vehicle *might* be uninsured. Although Williams's argument, which is mainly based upon unpublished opinions, may have some privacy-based appeal at first blush, it cannot be reconciled with our Supreme Court's recent unanimous decision in *Traft v. Commonwealth*, 539 S.W.3d 647 (Ky. 2018).

In *Traft*, an officer used a license-plate-reading camera of a vehicle encountered on patrol to discover that there was an active warrant for the vehicle's registered owner, Traft. The officer followed the vehicle and eventually pulled it over, solely because of information received from the computerized license plate search. After stopping the car, the officer noticed signs that the driver, who turned

---

[9] Because these issues were unpreserved, we cannot merely apply our typical two-step review of a trial court's denial of a motion to suppress whereby we first review whether the factual findings are supported by substantial evidence and then conduct a *de novo* review of the application of the law to those facts.

out to be the owner, Traft, was intoxicated.  The officer arrested Traft for both the

warrant and for driving under the influence.  Traft filed a motion to suppress,

arguing the officer violated his right to privacy by running his license and

registration information "for no reason."  *Id.* at 648.

The case wound its way to the Kentucky Supreme Court, which held

that Traft:

> certainly had no reasonable expectation of privacy in his
> license plate—either subjectively or objectively.  The
> plate was displayed on the exterior of Traft's vehicle (as
> required by law), while Traft drove on a public street.
> Likewise, Schepis [the officer] was driving on the same
> public street when he observed Traft's vehicle and
> collected the information from his license plate.  It is well
> settled that [w]hat a person knowingly exposes to the
> public . . . is not a subject of Fourth Amendment
> protection . . . . We agree with the Sixth Circuit, which
> held:
>
> > No argument can be made that a motorist
> > seeks to keep the information on his license
> > plate private. The very purpose of a license
> > plate number, like that of a Vehicle
> > Identification Number, is to provide
> > identifying information to law enforcement
> > officials and others.  The reasoning in [*New
> > York v.*] *Class*[, 475 U.S. 106, 106 S.Ct.
> > 960, 89 L.Ed.2d 81 (1986)] vis-a-vis
> > Vehicle Identification Numbers applies with
> > equal force to license plates:  "[B]ecause of
> > the important role played by the [license
> > plate] in the pervasive governmental
> > regulation of the automobile and the efforts
> > by the Federal Government to ensure that
> > the [license plate] is placed in plain view," a

-13-

> motorist can have no reasonable expectation
> of privacy in the information contained on it.
> 475 U.S. at 114, 106 S.Ct. 960.

*United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006).

*Id.* at 649-50 (internal quotation marks and citations omitted). The Court also

rejected Traft's argument that the stop was not based upon reasonable articulable

suspicion:

> Before initiating the stop, Schepis was armed with the
> knowledge that the individual to whom the vehicle was
> registered had an active arrest warrant against him.
> While it is true that Schepis did not know the identity of
> the driver when he initiated the stop, we hold that the fact
> that the owner of the vehicle was subject to seizure for
> violation of law creates an articulable and reasonable
> suspicion for an officer to initiate a traffic stop. This was
> not a case of a "snooping deputy" harassing a law-
> abiding citizen, as Traft argues. Rather, it was a case of
> an officer carrying out his sworn duty and abiding by the
> terms of a warrant issued by a court of this
> Commonwealth.

*Id.* at 651.

Obviously, the stop here was predicated upon a possible lack of

insurance for the vehicle, not a warrant. As a practical matter, however, the

situations are similar since both stops are based upon violations of the law gleaned

solely from an officer running the license plate of a vehicle randomly encountered

while on patrol through a computer. Indeed, not carrying insurance can subject a

person to being jailed, so we cannot accept Williams's argument that the

notification to check insurance did not provide Henry with articulable and reasonable suspicion for a public protection-based stop.[10] We agree with the Commonwealth's argument that the fundamental relevant holding of *Traft* is that "no reasonable suspicion was required before checking a motorist's license plate number with a license plate reading system because there is no expectation of privacy in a license plate" and so "information lawfully obtained by an officer running plates through a license plate reader was sufficient reasonable suspicion to conduct a stop."

Williams makes much of the lack of testimony here about what search system Henry used, or his familiarity and experience with the accuracy thereof. Although that was the focus of prior unpublished opinions, *Traft* contains no requirement that such testimony be adduced. Indeed, there is *no* discussion in *Traft* of the type of search engine used by the officer or the reliability thereof. If it believed such information to be required, our Supreme Court logically would have said so. At minimum, we cannot conclude that the lack of information about the computer program and Henry's experience with it was so fundamentally egregious to be deemed a palpable error. In short, we reject Williams's argument that the

---

[10] Kentucky Revised Statute (KRS) 304.39-080 requires an owner to insure a vehicle, and a failure to carry insurance can result in a jail term of up to ninety days under KRS 304.99-060(1)-(2), though we are cognizant that, in reality, a violator will often be cited instead of jailed.

initial stop was improper. But we agree with her secondary argument that Henry impermissibly prolonged the stop.

Generally, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350, 135 S.Ct. 1609, 1612, 191 L.Ed.2d 492 (2015). Of course, "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355, 135 S.Ct. at 1615 (citation omitted).

Initially, we reject Williams's argument that Henry improperly prolonged the stop by asking for identification from all occupants of the vehicle. Our Supreme Court recently made plain that an officer may do precisely that:

> an officer reasonably may ask for the identification and perform a criminal-records check of a driver *and any passengers* during an otherwise lawful traffic stop to determine an individual's prior contact with law enforcement. Such a task is an ordinary inquiry related to officer safety. *Accordingly, Officer Powers's collecting of [passenger] Carlisle's identification and subsequent checking of his criminal history was not an unrelated inquiry that prolonged the traffic stop*.

*Carlisle v. Commonwealth*, 601 S.W.3d 168, 179 (Ky. 2020) (emphasis added).

-16-

A petition for a writ of *certiorari* to the United States Supreme Court is pending in *Carlisle*. However, the Kentucky Supreme Court similarly recently held that "[a]n officer's ordinary inquiries incident to a traffic stop do not impermissibly extend such stop. Included in such ordinary inquiries are an officer's review of the driver's information, auto insurance and registration, and the performance of criminal background checks of the driver and any passengers." *Rhoton v. Commonwealth*, 610 S.W.3d 273, 276 (Ky. 2020) (footnotes omitted). *Carlisle* and *Rhoton* supersede our allegedly contrary decision in *Moffett v. Commonwealth*, No. 2014-CA-001638-MR, 2018 WL 5881686 (Ky.App. Nov. 9, 2018)(unpublished), upon which Williams relies.

Instead, Henry erred by extending the stop after arresting Williams's brother and receiving proof the vehicle was insured. Absent indicia of additional misconduct, it was incumbent upon Henry to end the stop since its purposes had been accomplished because "[i]f the traffic stop is prolonged beyond the time required for the purpose of the stop, the subsequent discovery of contraband is the product of an unconstitutional seizure." *Davis v. Commonwealth*, 484 S.W.3d 288, 292 (Ky. 2016) (internal quotation marks and citation omitted). And once Williams's husband had provided proof of insurance and her brother had been arrested, the *only* known purposes for the stop expired. Yet the stop continued.

-17-

Henry could have continued the stop if he had reasonable articulable suspicion that ongoing criminal conduct was occurring.  *See Moberly v. Commonwealth*, 551 S.W.3d 26, 31 (Ky. 2018) ("The question is whether the officer had a reasonable articulable suspicion of other ongoing illegal activity when he prolonged the stop[.]").  But Henry did not.

For example, Henry did not indicate that he had smelled marijuana emanating from the vehicle or had seen marijuana in plain view within it. Williams's pending criminal charges alone also were not sufficient.  "Mere charges do not constitute a 'criminal history' upon which one might reasonably suspect future criminal behavior."  *Id.* at 33.  And Williams's brother was arrested for a probation violation, evidence of which would not be contained in the vehicle. Moreover, the fact that Henry and her husband falsely told Henry that there was no contraband in the vehicle similarly cannot be used to justify extending the stop, or to search, because Henry could not have known the statements were false until after he had searched.  *See, e.g.,* 8 Ky. Prac. Crim. Prac. & Proc. § 18:22 (2020) ("Hindsight cannot be used to justify a search; rather the validity of the search must be viewed in light of the circumstances existing at the time the search or arrest was made."); *Sampson v. Commonwealth*, 609 S.W.2d 355, 358 (Ky. 1980) ("Probable cause must exist and must be known by the arresting officer at the time of the arrest.  It is not sufficient that we look at the evidence in retrospect to find

probable cause [or reasonable suspicion].").  Finally, the marijuana in the front seat area of the car was not discovered until after the search began, so its presence similarly cannot be used as a *post hoc* justification to extend the stop or to conduct a search.  In short, Henry did not have contemporaneous reasonable articulable suspicion of other illegal activity after proof of insurance had been shown and Williams's brother had been arrested, so continuing the stop was improper.[11]

Nonetheless, Henry *immediately* directed Williams to exit the vehicle (and did not return her identification until she had done so) and then persistently and repeatedly requested permission to search for several minutes before Williams's husband finally relented.  It is inescapable, therefore, that the stop was improperly extended for those minutes.  Perhaps these few minutes seem trifling, but our Supreme Court has stressed that "*any* prolonging of the stop beyond its

---

[11]  Of course, it is not inherently improper for a police officer to ask a person questions if compliance with the questions is voluntary.  But no reasonable person in Williams's position would have thought noncompliance with Henry was permissible.  *See*, *e.g.*, *Reynolds v. Commonwealth*, 393 S.W.3d 607, 610 (Ky.App. 2012) ("A detention or seizure is generally determined, in light of the surrounding circumstances, by whether a reasonable person would have felt free to leave."); *Commonwealth v. Lucas*, 195 S.W.3d 403, 405 (Ky. 2006) (citations omitted) (holding that "[c]ustody does not occur until police, by some form of physical force or show of authority, have restrained the liberty of an individual.  The test is whether, considering the surrounding circumstances, a reasonable person would have believed he or she was free to leave.").

Henry had gotten Williams to exit the vehicle, so to depart the scene, she would have had to either walk away on foot (in winter weather conditions) or re-enter the same vehicle Henry had recently gotten her to exit.  And Williams's husband would have had to drive away without his wife.  In other words, it is not reasonable to think that Williams and her husband were free to simply ride away into the night.

-19-

original purpose is unreasonable and unjustified; there is no '*de minimis* exception' to the rule that a traffic stop cannot be prolonged for reasons unrelated to the purpose of the stop." *Davis*, 484 S.W.3d at 294.

The Commonwealth argues that Henry could have ordered Williams to exit the car pursuant to the traffic stop. We agree that he could have. *Owens v. Commonwealth*, 291 S.W.3d 704, 708 (Ky. 2009) (holding that "an officer has the authority to order a passenger to exit a vehicle pending completion of a minor traffic stop"). But Henry did not get Williams to exit the vehicle until after the legitimate expressed purpose for the stop had already been accomplished.

Moreover, permitting officers to order passengers to exit vehicles during traffic stops is based upon attempting to minimize the risk to officers. *Butler v. Commonwealth*, 367 S.W.3d 609, 613 (Ky.App. 2012). Henry did not testify that he believed he was in danger, and the Commonwealth does not dispute Williams's assertion that she was never even frisked prior to arrest, which greatly undercuts any concerns about officer safety. Moreover, if he were concerned about his safety, Henry logically would also have removed Williams's husband from the vehicle since he would have theoretically been equally as dangerous.

Finally, our result is unchanged by the fact that Henry could have ordered Williams and her husband to exit the vehicle during a lawful search thereof. *See, e.g., Carlisle*, 601 S.W.3d at 181. Because the search here occurred

-20-

after an improperly extended stop, it was not lawful (and, in any event, Henry got Williams to exit before the search even began).

In conclusion, the stop was improperly extended, so the search was improper. Evidence discovered during a search stemming from an improperly extended stop "is the product of an unconstitutional seizure." *Davis*, 484 S.W.3d at 292 (citation omitted). A conviction based primarily upon evidence acquired outside constitutional bounds is manifestly unjust and cries out for relief (*i.e.*, is a palpable error). The trial court should have granted the motion to suppress, and its failure to do so resulted in manifest injustice to Williams.

For the foregoing reasons, the Boone Circuit Court's denial of Williams's motion to suppress is reversed, and Williams's judgment of conviction, which was premised upon that suppression ruling, is vacated. This case is remanded to the Boone Circuit Court with instructions to grant Williams's motion to suppress and for all proper further proceedings.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Steven Nathan Goens
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Lauren Lewis
Assistant Attorney General
Frankfort, Kentucky